GUTHRIE, RESPONDENT, *v.* HOLLORAN ET AL., APPELLANTS.

(No. 6,797.)

(Submitted September 12, 1931. Decided September 26, 1931.)

[3 Pac. (2d) 406.]

*Mr. John K. Claxton,* for Appellants, submitted a brief and argued the cause orally.

*Mr. George D. Toole* and *Mr. C. S. Wagner,* for Respondent, submitted a brief; *Mr. Toole* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted to recover $375 damages for the conversion of a Chevrolet automobile. The complaint is in ordinary form. The defendants, by their answer, made general denial of the material allegations of the complaint and by way of cross-complaint, designated counterclaim, sought to recover the sum of $126 on a promissory note executed and delivered to the defendants on July 18, 1928, upon the exchange of an Essex used automobile for the Chevrolet car involved, together with attorney's fees and costs. Issue was

joined by reply, and the cause was tried to a jury, which rendered verdict against the defendants and in favor of the plaintiff for the sum of $275, together with interest thereon from July 18, 1928. Judgment was regularly entered accordingly. The defendants moved for a new trial, which was denied, and the cause is now before us on appeal from the judgment. During the progress of the trial the defendants made motion for a nonsuit and also for a directed verdict, both of which were denied.

The determinative question presented for decision by the defendants' several assignments of error is whether the evidence is sufficient to support the judgment.

From the testimony it appears without dispute that at the noon hour of July 18, 1928, the plaintiff visited the used-car lot operated by the defendants, adjacent to the building in which they were conducting an automobile sales business and repair-shop, contemplating a trade of his Chevrolet car for another used automobile, and was then and there shown a "Hudson coach" by M. W. Wren, who was at the time in the employ of the defendants. As the plaintiff was then in a hurry to return to his work, he gave Wren his residence address, and that evening about 7 o'clock Wren, accompanied by his wife, visited the plaintiff at the latter's home, driving the Hudson coach. For a demonstration the plaintiff and his wife thereupon got into the automobile which was driven by Wren, the plaintiff sitting in the front seat with the driver and Mrs. Guthrie in the back seat with Mrs. Wren. After taking a trip around Lake Avoca, they returned to the plaintiff's residence. Thereupon the plaintiff exhibited his Chevrolet touring car to Wren, and after examining it, Wren made the plaintiff an offer of $275 allowance on a trade for the Hudson coach. The plaintiff raised some objection respecting the condition of the upholstering and tires of the Hudson car. Wren suggested that the plaintiff keep it and drive it, to which the plaintiff acquiesced, and the latter thereupon removed some tools and a tow rope from the Chevrolet car, placed them in the Hudson car, and Wren drove away with

the Chevrolet car, leaving the Hudson car in the plaintiff's possession. Before leaving the Guthrie residence, Wren said to the plaintiff: "I'll take your Chevrolet into town and you keep the Hudson coach out here tonight and drive it tonight and tomorrow, and bring it in tomorrow night. I think we can agree upon a price between the two cars." After Mr. Wren left, the plaintiff and his wife got into the Hudson car and drove it about that evening. The next day Mrs. Guthrie and the plaintiff discussed the proposed trade, and decided they wanted a smaller, better car than the Hudson, and Mrs. Guthrie so advised the defendant Halloran, in consequence whereof the Hudson car was taken back to the defendants' garage. That evening, July 19, about 7 o'clock, Wren again called at the plaintiff's residence driving an "Essex coach." The plaintiff then inquired what had become of the Hudson car. Wren replied that he had a buyer for it and had sold it, and then guaranteed the Essex coach to the plaintiff, and said it was in better shape than the Hudson. The plaintiff said to Wren that he (the plaintiff) wanted his tools out of the Hudson car, so Wren invited the plaintiff to get into the Essex car and they would go down to the garage and get such tools. The plaintiff, accompanied by his wife and her sister, thereupon got into the Essex car and Wren drove them to the defendants' place of business. Upon arriving there Wren asked the plaintiff to go into the office and sign some papers "for the Essex coach," which he did.

In this connection the plaintiff testified: "I went in and signed up some papers; I didn't read them, but I signed them up. * * * When I signed the papers I signed in three or four different places, and then we came out and he gave me my tools, and I got into the Essex coach again. * * * I remember signing a note at that time for $126. * * * Q. What was the purpose of giving that note, if you know? A. Well, it was for the car, for the value of $475, as I understood it,—I mean that was the difference I was to pay, the difference between that and my Chevrolet, and I understood the amount I was to pay was $126. * * * What I

remember signing at that time, seems to me were notes to the Great Falls Finance Company. I didn't read them, and didn't pay very much attention to them,—just signed where they asked me to sign. I don't remember reading a contract in which my Chevrolet car was mentioned. * * * After I signed this note he handed me my tools and I went out and got in this Essex coach, and my wife and sister were still sitting there. I then took the wheel myself and started to drive home.''

In driving back to his residence plaintiff had considerable trouble in the operation of the Essex car and finally had to be towed in. The next evening, he says that he called a mechanic from the A. & A. garage who responded to fix the automobile, in order that he might run it back to the defendants' place of business. The morning of the 21st the plaintiff, not being able to start the car, instructed his wife to telephone the defendants and have them ''send out their machinist to fix the car.'' The car was taken away that day by the defendants, and in the evening, about 7 o'clock, was returned. Upon its return the plaintiff directed the driver to leave it in the alley as he wished to use it, but the driver put it back in the plaintiff's garage.

From the night of July 19, when the contract was signed, to the 21st, the plaintiff said nothing to the defendants and made no demands upon them. After the Essex car had been fixed by the defendants, the plaintiff did not attempt to use it until the morning of the 22d, when he drove it to the garage of the defendants, looking for a different car in trade. He then wanted a Nash car, which he had seen on the sales lot, but was informed that it had been sold. He then asked about a Dodge coach, but was advised that it was not in satisfactory working condition. He demanded the return of the Chevrolet car, but was told that it had been sold. He then left the Essex car on the used-car lot with the keys in the ignition, and went away. Before so leaving the car he was advised by Wren that the latter had no authority to take it back. That night, July 22, the Essex car was stolen

from the sales lot, taken away, and when later found was a total wreck and of no value. By the terms of the conditional sales contract for the purchase of the Essex car, the plaintiff in writing agreed to an allowance of $275 on his Chevrolet car and to pay the balance of the purchase price of the Essex car in six equal monthly installments, thus making the total charge to the plaintiff for the Essex car of $401, which contract, with the note, was regularly assigned by the defendants on July 19, to the Finance Corporation of Wyoming, at Great Falls, Montana, the contract being filed for record July 26, 1928. The plaintiff has not paid any of the installments due on the purchase of the Essex car pursuant to the terms of his contract, and in consequence of its destruction defendants were compelled to pay, and did pay, the Finance Corporation the amount of the note, $126, and thereby became repossessed of the same as owners and holders, and likewise of the conditional sales contract, being such at the time of the filing of the defendants' answer, December 7, 1928, and on the date of the trial, February 27, 1930. The plaintiff was at the time familiar with such contracts, having before made purchase of automobiles in like manner. The plaintiff made no allegation of fraud or misrepresentation in his complaint, the action being simply one in conversion, and was tried as such.

The judgment must stand or fall on the evidence adduced at the trial. It is our opinion the plaintiff did not by his proof establish the cause of action stated in his complaint, and that the evidence supports the defendants' so-called counterclaim, which, in view of its allegations, should be treated as a cross-complaint. The evidence does not support the cause of action pleaded by the plaintiff, and in consequence the variance is fatal to his right of recovery. It was incumbent upon the plaintiff to prove a wrongful taking of his Chevrolet automobile by the defendants, as in his complaint alleged. In this he wholly failed. On July 18, 1931, the date of the alleged conversion, the Chevrolet automobile was in the lawful possession of the defendants, and legal title to it passed to the defendants the following day, when the plaintiff executed the

contract for the purchase of the Essex car, even though the plaintiff did not read the contract or know what papers ▆ he signed. It will not suffice to avoid the obligation of a written contract for one of the parties thereto to say that he never read it before affixing his signature, or that he did not understand the nature of the obligation imposed. (*W. T. Rawleigh Co.* v. *Washburn,* 80 Mont. 308, 260 Pac. 1039; *Zimmerman* v. *Mutual Life Ins. Co., ante,* p. 336, 3 Pac. (2d) 278.) The plaintiff's remedy, if any, was an action for damages for breach of warranty or to rescind the contract which had become executed, and the recovery of damages on the ground of fraud, if any existed.

Every unauthorized assumption of dominion over personal ▆ property in hostility to the right of the true owner is conversion. (2 Estes' Pleadings, by Boone, 4th ed., sec. 2100.) And the detriment caused by the wrongful conversion is presumed to be the value of the property at the time of its conversion with interest from that time. (Sec. 8689, Rev. Codes 1921.) The questions to be tried in an action for conversion of personal property such as this relate to the ownership and right of possession, and a wrongful taking by the defendants.

The district court was in error in not sustaining the defendants' motion for a nonsuit because of the plaintiff's failure to prove his case. As to the defendants' cross-complaint, the proof stands uncontradicted that the defendants are the lawful owners and holders of the plaintiff's note for the sum of $126, interest bearing as therein provided. Accordingly, the defendants' motion for a directed verdict should have been sustained.

The judgment is reversed, and the cause remanded to the district court of Silver Bow county with directions to enter judgment in favor of the defendants and against the plaintiff for the full amount of the note, together with interest and reasonable attorney's fees, as therein provided.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES FORD, ANGSTMAN and MATTHEWS concur.