No. 14461

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

DEAN LYLE,

Plaintiff and Respondent,

-vs-

MAX S. MOORE and PEARL MOORE,

Defendants and Appellants.

---

Appeal from: District Court of the Twelfth Judicial District,
Honorable B. W. Thomas, Judge presiding.

Counsel of Record:

For Appellants:

Jardine, Stephenson, Blewett and Weaver, Great Falls, Montana
Lon Holden argued, Great Falls, Montana

For Respondent:

Bunn and Brown, Chester, Montana
Bruce Brown argued and Gregory G. Parrott argued, Chester,
Montana

---

Submitted: May 2, 1979

Decided: JUL 2 3 1979

Filed: JUL 2 3 1979

*Thomas J. Kearney*
                        Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This appeal is from a judgment in plaintiff's favor entered in the Twelfth Judicial District Court, Liberty County, the Honorable B. W. Thomas presiding without a jury.

Plaintiff, Dean Lyle, is a real estate broker and one-time close friend of defendants, Max and Pearl Moore. In early 1975, Lyle learned through a third party that the Moores were considering selling the portion of their farm located in the Province of Saskatchewan, Canada. Lyle contacted the Moores and told them, among other things, that he knew a prospective purchaser who would pay more for the farm than they were thinking of asking.

On March 3, 1975, the parties signed a real estate broker's contract for the sale of the farm. The contract was a one-page document which was to expire April 1, 1975. The contract contained the following language:

> ". . . you hereby are granted the absolute, sole and exclusive right to sell or exchange the said described property. In the event of any sale, by me or any other person . . . during the term of your exclusive employment, or in case I withdraw the authority hereby given prior to said expiration date, I agree to pay you the said commission just the same as if a sale had actually been consummated by you."

The contract further provided that Lyle would receive 6 percent of the $220,000 selling price, or $13,200 for his services.

Lyle then brought Gene Foulks, the prospective purchaser, from Kansas to Montana to view the property. Lyle, Foulks and Max Moore inspected the property on March 4 and visited a Canadian attorney. The attorney advised the parties that a sale of the Moores' farm to Foulks and his wife would not be legal under the Saskatchewan Farm Owner-

ship Act of 1974. However, after some discussion, it appeared that a sale would be possible to Foulks and his brother or father.

Foulks returned to Kansas to work out the details, and the Moores visited their accountant to discuss the tax consequences of their sale. During their conversation, the accountant asked why the Moores were not selling the farm to their sons. They told him they had thought such a sale would be illegal but would now contact their sons. On March 10, 1975, the Moores withdrew Lyle's authority to sell the property and subsequently sold the property to their sons.

Lyle brought this action to recover the commission provided for in the contract. Following a trial in the District Court, judgment was entered in his favor in the amount of $13,200 plus $7,500 as attorney's fees and $155 for other costs. From this judgment, the Moores appeal.

One issue presented by defendants is determinative on appeal. That issue is whether the listing agreement signed by defendants was invalid because plaintiff used it to take advantage of defendants without their consent or knowledge.

The District Court made two pertinent findings of fact with respect to this issue:

> "10. Plaintiff and defendants on March 3, 1975, had been long-time friends and neighbors. Defendants had confidence in plaintiff's integrity and his professional ability and when plaintiff asked them to sign the employment contract they did so without taking time to read it. They had no previous experience with such agreements. They did not understand that, under the withdrawal clause quoted in Finding 3, they would be liable to plaintiff for the full amount of his commission if they withdrew his authority before the expiration date. Nor did they understand that they could not make a sale on their own during the term of the agreement. Otherwise, they do not claim that the terms of the listing agreement do not conform with their understanding.

"11. No fraud, misrepresentation or undue
influence on the part of plaintiff induced
the execution of the employment contract by
defendants. The circumstances are insuffi-
cient to excuse the failure of defendants to
read the employment contract before signing
it."

It is this latter finding with which we take issue.

In Carnell v. Watson (1978), ____ Mont. ____, 578 P.2d
308, 312, 35 St.Rep. 550, 555, we recognized a fiduciary
relationship between a real estate broker and his client.
This fiduciary relationship between a broker and his client
has been found to encompass a "duty of full disclosure" by
a number of courts.

In Batson v. Strehlow (1968), 68 Cal.Rptr. 589, 441
P.2d 101, 109-10, the California Supreme Court found:

"The law imposes on a real estate agent 'the
same obligation of undivided service and loy-
alty that it imposes on a trustee in favor of
his beneficiary.' [Citations omitted.] This
relationship not only imposes upon him the
duty of acting in the highest good faith
towards his principal but precludes the agent
from obtaining any advantage over the princi-
pal in any transaction had by virtue of his
agency. [Citation omitted.] 'Such an agent
is charged with the duty of the fullest dis-
closure of all material facts concerning the
transaction that might affect the principal's
decision.' [Citations omitted.]

"When the principal questions the acts done
by the agent in the course of the agency the
burden is cast upon the latter to prove that
he acted with the utmost good faith toward
the principal and that prior to the transac-
tion he made a full disclosure of all the
facts relating to the acts under attack."

A duty to fully disclose pertinent facts has likewise been
recognized in Zwick v. United Farm Agency, Inc. (Wyo. 1976),
556 P.2d 508, 511; MacDonald v. Dormaier (1975), 272 Or.
122, 535 P.2d 527, 529; Jennings v. Lee (1969), 105 Ariz.
167, 461 P.2d 161, 167; Holland Realty Investment Co. v.
State Dept. of Commerce (1968), 84 Nev. 91, 436 P.2d 422,
426.

The duty includes the duty to reveal the nature and extent of the broker's fees to the client. Rushing v. Stephanus (1964), 64 Wash.2d 607, 393 P.2d 281, 284. Furthermore, because of the fiduciary relationship between a broker and his client, the broker "must make a full and understandable explanation to the client before having him sign any contracts, particularly when the contracts are with the broker himself." Starkweather v. Shaffer (1972), 262 Or. 198, 497 P.2d 358, 360.

In addition to this we have recognized that:

"The provisions of the Real Estate License Act [section 37-51-101 et seq. MCA] set a standard of conduct to which licensed brokers and salesmen must conform.

". . .

"While a breach of a duty may also be a violation of the licensing act, it may also constitute an independent reason to deny a commission to the broker or agent--perhaps the most effective deterrent of all." Carnell v. Watson, 578 P.2d at 311-12, 35 St.Rep. at 554-55.

Along these lines, two relevant portions of plaintiff's own testimony indicate that he did not fully disclose to defendants the fact that he would be entitled to his commission if they withdrew his authority to sell prior to the April 1st deadline. First, defendants' counsel had the following exchange with plaintiff:

"Q. And did you tell them at that time that if they sold the property during the listing period that you would be entitled to your full commission? A. I don't recall that I did, no.

"Q. Did you inform them of the existence of this withdrawal clause that says if they would withdraw your authority during the listing period they would have to pay you a full commission just as if you had sold the property for them? A. I don't recall if I went into it other than to read through it. I was sure there was no problem with the situation. The parties were going to buy it or not buy it and that was it."

-5-

Later, plaintiff indicated he had reviewed the proposed terms of the sale with defendants but when asked specifically about any discussion relating to the printed language on the form, he could not recall any such discussion.

That plaintiff's failure to point out the potential effect of defendants' early withdrawal of authority might seem like a small oversight is not borne out by the amount of the judgment in this case. It was a significant part of the contract which defendants signed and should not have been overlooked. There is further testimony which indicates that plaintiff hurried defendants' signing and even encouraged them not to read the contract before signing it.

Defendant Max Moore testified on direct examination as follows:

"Q. Did you and your wife and Mr. Lyle discuss whether that agreement should be read by you and your wife? A. Well, I didn't, and--but my wife asked Mr. Lyle, she said at that time, she said, after I had already signed it, that maybe she should read the fine print before she signed her name to something and that's, Mr. Lyle kind of laughed and he said that wasn't necessary. He said, I just want this to show the Kansas man. So then she signed it. But she didn't read anything.

"Q. Did Mr. Lyle at that time review the listing agreement with you? A. No. The only thing he reviewed was the writing he put on it. He never did review any of the fine print typed on it. Just what he wrote on there, himself.

". . .

"Q. Your testimony then is the printed language of the listing agreement was not reviewed with you at that time, is that correct? A. That's true.

"Q. Did Mr. Lyle at that time inform you that by the agreement he had the exclusive right to sell the property at that time? A. No.

"Q. Did you at that time believe you still had the right to sell that property? A. Oh, I thought I did.

"Q. Did he at that time inform you that he could collect his full commission if, in fact, you made a sale of that property, yourself, during the listing period?  A. No.

"Q. Did he inform you at that time that if you withdrew his authority during the listing period that he would be entitled to his full commission in the amount of thirteen thousand two hundred dollars ($13,200.00)?  A. No.

"Q. Were you given an opportunity to read the contract at that time?  A. No.

"Q. Why not?  A. Well, he was in, seemed to be in a hurry.  Wanted to get it signed and then, of course, I didn't ask him to read it but my wife had mentioned it and he said it was, there was no reason to read it."

As we have noted, there are times when the law imposes a duty upon a party to speak rather than to remain silent and thereby to disclose information to place the person with whom he is dealing on an equal footing with him.  The failure to speak in such a case amounts to the suppression of a fact which should have been disclosed and constitutes fraud. Wheeler v. Missouri P.R. Co. (1931), 328 Mo. 888, 42 S.W.2d 579, 583; Dirks Trust and Title Co. v. Koch (1913), 32 S.D. 551, 143 N.W. 952, 953.

Here the fiduciary relationship which exists between a broker and his client, imposed upon plaintiff a duty to disclose a number of facts which were not disclosed.  These included the fact that defendants could not withdraw plaintiff's authority under the agreement without forfeiting a sizeable commission, nor could they sell the property on their own during the term of the agreement.  The District Court erred in finding there was no fraud involved in the execution of the employment contract and the judgment of the District Court must be reversed.

With respect to attorney fees, we note the following provision in the broker's contract:

> "In case of suit or action on this contract,
> I agree to pay such additional sum as the
> court may adjudge reasonable as plaintiff's
> attorneys fees."

By virtue of section 28-3-704 MCA, this contractual right to attorney fees is reciprocal. Therefore, the case is remanded for determination of and an order awarding reasonable attorney fees to defendants.

Reversed and remanded.

_____
Chief Justice

We concur:

_____

_____
Justices

-8-

Mr. Justice John C. Sheehy dissents:

It is straining the theory of fiduciary relationships a bit to hold that between a realtor and a seller of real property, the relationship exists before the execution of an enforceable listing agreement or earnest money agreement. A fiduciary relationship was held to exist before the signing of an earnest money agreement in Starkweather v. Shaffer (Ore. 1972), 497 P.2d 358, 360, but that was a case involving intentional deceit on the part of the realtor. A fiduciary relationship applies when the parties are not on equal footing, which does not appear to me to be the case here. However, we have held that as between a realtor and the seller, a fiduciary relationship does arise, especially after the listing agreement has been signed. Carnell v. Watson (1978), ____ Mont. _____, 578 P.2d 308, 35 St.Rep. 550. I would concede, for the sake of argument here, that prior to the execution of the listing agreement, a fiduciary relationship existed between the owners (Moore) and the real estate agent (Lyle), although this has not been specifically held to be true in Montana until now.

Even so, the duty of the fiduciary (Lyle) to make full disclosure to his beneficiary (Moore) does not apply where the beneficiary has equal and full opportunity, or the means at hand, to acquire knowledge of the facts on his own. It is stated in Lee v. Stockmen's Nat. Bank (1922), 63 Mont. 262, 284, 207 P. 623, 630, that:

> "When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself, or that the means were at hand to ascertain the truth . . . of any representations made to him, his reliance upon such representations made to him, however false they may have been, affords no ground of complaint (citing cases)."

See also, Lowe v. Root (1975), 166 Mont. 150, 156, 531 P.2d 674, 677.

-9-

Here, the Moores, each of whom can read, and of whom the husband especially has a long experience in contractual matters, had before them in its entirety, the one-page listing agreement with its terms set out for their reading. In that situation they are in no different position than any other prospective contractor, absent fraud or coercion, in their duty to read and know the contents of any agreement they sign. It will not suffice for them to say later they never read the instrument before affixing their signatures, or did not understand the obligations imposed by the contract. Guthrie v. Halloran (1931), 90 Mont. 373, 380, 3 P.2d 406, 408.

The exceptions to the rule, of course, are fraud or coercion. It is injudicious to hold that the plaintiff here defrauded the Moores. The District Court did not find so, and under ordinary appellate rules, we are bound by fact determinations of the District Court. Rule 52(a), Mont.R.Civ.P. The record does not show any act or representation by Lyle which led the husband Moore to sign without reading. The grounds relied on by the majority to show the wife was misled are paper-thin, and were rejected by the District Court. In fact, the husband testified he read over the listing agreement a few days later and understood it. It was with that knowledge that he withdrew from the contract before the time expired. He did not move to rescind the contract. Rather Moore testified emphatically that the reason he withdrew Lyle's authority was that Moore had reached the conclusion the sale to the Kansan was void under Canadian law.

It should be made clear that the Moores were at all times aware of the size of the commission involved for a total selling price of $220,000 under their agreement. The husband Moore had in his possession defendant's exhibit 2, which he produced at trial, and which was given to him by Lyle prior to the execution of listing agreement, which shows on it "commission 6% of selling price $13,200.00."

-10-

The majority opinion that Lyle committed a fraud goes against the warp of the evidence.  There is every indication that he acted fairly:  He found a buyer who would pay $15 more per acre than the Moores could find on their own; the length of time of the listing agreement was 28 days, certainly not a long time for an exclusive listing; he procured an attorney to ascertain what the Canadian law required.  The listing agreement which he presented to the Moores was a standard one, and its provisions respecting withdrawal are the common provisions one finds in the real estate business in Montana.  For doing business in the ordinary way, he has been found fraudulent.  Not only does he lose the commission, his attorney fees and costs, but he has now been subjected to attorney fees for the other side. I cannot agree with that result.

_____
Justice

I concur in the foregoing dissenting Opinion.

_____
Justice