No. 83-282

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

HARRY COE GIBSON,

Plaintiff and Respondent,

-vs-

WESTERN FIRE INSURANCE COMPANY,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable James M. Salansky, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Garlington, Lohn & Robinson; Bradley J. Luck and
Sherman V. Lohn argued, Missoula, Montana

For Respondent:

Robert P. Ryan argued, Billings, Montana

---

Submitted: January 16, 1984

Decided: June 4, 1984

Filed: JUN 1984

*Ethel M. Harrison*
_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

In an action against Western Fire Insurance Company for its bad faith refusal to settle a third party malpractice claim within policy limits, judgment was entered in the Eleventh Judicial District Court, Flathead County, for compensatory damages of $250,000 and punitive damages of $300,000. Western appeals the judgment.

Western contends (1) that the judgment against it should not stand because improper standards determining the bad faith of an insurer were applied; (2) that the compensatory damages are excessive and not supported by the evidence; (3) that the judgment for punitive damages is improper and not supported by the evidence; and (4) that the District Court committed instructional error.

Having considered the issues we affirm the judgment of the District Court.

On October 16, 1975, Gibson, a Kalispell opthalmologist, pierced Harold Frisnegger's eyeball with a needle while endeavoring to administer a local anesthetic to his left upper eyelid. The doctor's objective in injecting the anesthetic was to remove a small growth, a chalazion, from Frisnegger's left upper eyelid. The piercing of the eye was not immediately known either to Frisnegger or to Gibson. In a matter of only a few days a cataract formed in Frisnegger's left eye which had the practical effect of occluding his vision in that eye.

Gibson recognized the injury and what had happened a short time later when the patient returned for a follow-up. Immediately the doctor informed his patient what had happened

and that it was the doctor's fault. Then the doctor notified his local insurance agent and on the agent's directions, notified Western in writing of the incident, stating that "in the case of Mr. Frisnegger there is no question of my carelessness."

Western's end of the Frisnegger claim was handled principally by Milton Beck, an attorney and regional claims supervisor for Western at Salt Lake City, Utah, and by Kenneth O'Brien, a Kalispell attorney. John Hoyt of Great Falls was the attorney representing Frisnegger.

Suit by Frisnegger against Gibson was filed in District Court in Flathead County on November 19, 1976. Trial before a jury started on October 17, 1977 and resulted in a jury verdict against Gibson in favor in Frisnegger in the sum of $175,000. Judgment was entered on the verdict, and the case was appealed by Gibson to this Court. We affirmed the judgment. Frisnegger v. Gibson (1979), 183 Mont. 57, 598 P.2d 574.

Gibson's malpractice liability coverage with Western had policy limits of $100,000. On September 4, 1979, Gibson paid $83,750 to Frisnegger, representing the excess of his policy limits and interest due on that date. Gibson then instituted suit in the District Court, Flathead County, against Western alleging negligence and bad faith on the part of Western for refusing to settle the Frisnegger claim within Gibson's policy limits. Judgment against Western resulted, and is the subject of this appeal.

Further facts relative to the issues will be detailed later in this opinion.

I.

Duty of An Insurer to Settle Third Party Claims Within Policy
Limits;Refusal as Bad Faith; Sufficiency of Evidence.

It is now fairly established in American jurisprudence
that an insurer which in bad faith fails to settle a bona
fide third party liability claim against its insured, within
policy coverage limits, takes the risk of a judgment by the
trier of fact in excess of the coverage limits. The effect
of such bad faith is to open the policy coverage limits to
the extent of the trial result. That degree of liability was
established in Montana in the federal district court in
Jessen v. O'Daniel (D. Mont. 1962), 210 F.Supp. 317; aff'd.
National Farmers Union Property and Casualty Company v.
O'Daniel (9th cir. 1964), 329 F.2d 60. This Court accepted
the concept of bad faith liability against the insurer in
third party liability claims in Fowler v. State Farm Mutual
Automobile Insurance Company (1969), 153 Mont. 74, 454 P.2d
76 and Thompson v. State Farm Mutual Automobile Insurance
Company (1973), 161 Mont. 207, 505 P.2d 423, although in each
state case the insurer was vindicated. Another federal case
refining bad faith liability of insurers in third party
claims is Fetter Livestock Company v. National Farmers Union
Property and Casualty Company (D. Mont. 1966), 257 F.Supp. 4.

The duty to accept a reasonable offer within policy
coverage limits arises from an implied covenant of good faith
and fair dealing that neither party will do anything which
will injure the right of the other to receive the benefits of
the agreement. One of the usual benefits of a liability
insurance policy is the settlement of claims without
litigation, or at least without trial if the cause is
litigated. The implied obligation of good faith and fair
dealing requires the insurer to settle in an appropriate

- 4 -

case, although the express terms of the policy do not impose the duty. In determining whether to settle, the insurer must give the insured's interest as much consideration as it gives its own interest. Crisci v. Security Insurance Company (1967), 58 Cal.Rptr. 13, 426 P.2d 173, 66 Cal.2d 425; National Farmers, 329 F.2d at 64-65.

When a liability insurance company by the terms of its policy obtains from the insured a power, irrevocable during the continuance of his liability under the policy, to determine whether an offer of compromise of a claim shall be accepted or rejected, it creates a fidiciary relationship between the insurer and the insured with resulting duties that grow out of such a relationship. American Fidelity & Casualty Company v. G. A. Nichols Company (10th cir. 1949), 173 F.2d 830, 832.

Malice on the part of the insurer is not a necessary component to impose liability upon an insurer for bad faith refusal to settle. This is so because the failure to settle may have been the result of either bad faith or negligence, and there is no clear distinction in Montana between the two terms in such cases. In Jessen, supra, the court stated that while there may be theoretical differences between bad faith and negligence, the resulting neatness is highly illusory, and the two tests have tended to coalesce. Of course, malice, oppression or fraud is necessary to establish a basis for punitive damages. Section 27-1-221, MCA.

Each case must be decided on its own facts, but the parties seem to agree here that as a starting point the six elements of bad faith set forth in Jessen, should be considered.

We will first set forth the facts, and then consider them under the Jessen elements. The home office of Western received Gibson's notice of the incident and referred it to Beck in Salt Lake City for handling. He set up a minimum reserve of $1,000 for the claim pending the receipt of information, and referred the file in late December 1975 to counsel O'Brien. At that time Frisnegger was represented by an attorney in Spokane, Washington, and O'Brien got in touch with him. O'Brien was advised that Frisnegger had been examined recently and the details of the examination would be forthcoming. In the meantime, O'Brien met with Gibson and reviewed the file in detail.

In January 1976, O'Brien reported the status to Western and suggested the need for an independent medical examination. In early February, O'Brien again discussed the matter with Spokane counsel and was advised that the latest medical examination revealed the existence of the cataract, and that the attending physician had recommended removal but suggested a few months wait. O'Brien decided to wait for additional medical information before setting up an independent medical examination. Nothing further occurred until the middle of July 1976 when attorney John Hoyt of Great Falls informed O'Brien that he was now in the case representing Frisnegger.

Hoyt suggested a meeting between Beck, O'Brien and himself to discuss the case and forwarded to O'Brien a detailed statement outlining the facts on which the claim was based and Hoyt's position on the matter. O'Brien was advised that Frisnegger's treating physician recommended surgery, but Frisnegger had elected not to have such surgery. By this time Gibson had advised O'Brien that surgery would be the

only hope of improving Frisnegger's condition and that such surgery was low risk.

On August 3, 1976, O'Brien and Beck met with Hoyt in Great Falls. There O'Brien informed Hoyt that Frisnegger had an obligation to mitigate his damages by undergoing the low risk, probably successful operation. Hoyt advised that he would recommend to his client that the case be settled for $75,000, and that the figure was firmly non-negotiable. O'Brien learned from other attorneys in Great Falls that Hoyt's "non-negotiable" stance meant that Hoyt would stand firm on his demand.

Upon recommendation of Dr. Gibson, Western caused Frisnegger to be examined by Dr. Charles Gates in Spokane on September 17, 1976. Dr. Gates confirmed that Frisnegger's left eye was essentially nonfunctional, and stated he would recommend cataract surgery for the left eye. He reported that it "could be restored to normal vision with cataract extraction and contact lens." From the information provided by Dr. Gates, O'Brien and the claims manager for Western formed the opinion that Frisnegger had a duty to mitigate his damages and if he were willing to do so, his damages would be of a small magnitude.

It was on September 27, 1976, that O'Brien wrote to Hoyt enclosing a copy of the medical report of Dr. Gates. O'Brien informed Hoyt that in view of the Gates report, O'Brien could not recommend to Western that the case be settled for the sum of $75,000. No specific counter-offer was made.

Later correspondence established that O'Brien had sent the materials including the Gates report to the company and was waiting for an evaluation of the case. Hoyt wrote on October 11, 1976 he would be willing to file the suit outside

Flathead County, or to arrange to "pull the file" from the clerk's office so that there would be no publicity against Gibson, or at least a minimum of publicity.

On November 4, 1976, Hoyt wrote asking what was going on with the claim. On receipt of the letter, O'Brien telephoned Beck in Salt Lake City and they discussed the claim. O'Brien testified that Beck "concurred with my recommendation" that the claim did not have a value of $75,000.

As a result of the conference with Beck, O'Brien wrote to Hoyt setting up the position of Western that the cataract was removable and that a reasonable and prudent person would submit to the operation and that this was not a case of irretrievable loss of eyesight. Further, O'Brien "to test [Hoyt's] offer" advised Hoyt that Western would pay all present and future medical expenses and all loss of income that Frisnegger had sustained, and would make allowance to pay him for pain and suffering. No dollar amount was fixed in connection with this proposal. Hoyt did not respond to the letter. In a subsequent letter, O'Brien advised Hoyt that Western, if Frisnegger decided to have surgery, would pay for all the expenses of that surgery, all of the lost wages during the time that he was laid up, and proceed to suit on the issue of damages, asking that they be given credit for whatever they had paid. Again Hoyt did not respond.

In a memorandum to his home office claims supervisor dated December 29, 1976, Beck reported on a conversation with O'Brien stating "We also agreed that $75,000 is totally out of line for this case and our current plans are to line up ample medical evidence that would indicate that the claimant could return to normal vision if he had a cataract

operation."     Hoyt filed suit against Gibson in December 1976.   The suit was filed in Flathead County.   Hoyt mailed the original complaint, and admission of service for Gibson to sign, and the check for the filing fee to O'Brien, who filed the suit, obtained Gibson's signature on the admission, and checked out the complaint from the clerk's office.   At about this time, Western's loss reserve on the claim was raised from the original $1,000 to $25,000.   On December 20, 1976, Hoyt addressed a letter to O'Brien referring to a verdict of $675,000 which had been awarded in an eye case.

Sometime prior to the filing of the suit by Hoyt, O'Brien and Beck had agreed that the Frisnegger claim had a settlement value up to $45,000.   O'Brien testified that it had a low range of $35,000 and a high range of $45,000.   No documentation of this evaluation appears in Western's file. The testimony indicates that the evaluation was arrived at through telephonic communication between Beck and O'Brien, who were discussing the claim, but no letter or memorandum appears in the evidence that would indicate how the evaluation came about.   The testimony is that Beck and O'Brien related to some personal experience with claims for loss of eyesight where each had experienced significantly lower results for total loss of eyesight in one eye.

With the filing of the lawsuit by Frisnegger against Gibson, Western took steps to advise him of the possibility of an excess judgment.   The letter, written by Beck to Gibson, on December 10, 1976, included in pertinent part:

> "This matter has been referred to Mr. Kenneth O'Brien of Hash, Jellison & O'Brien, Plaza West, 136 First Avenue West, Kalispell, Montana, for defense.   However, even though the complaint does not state an amount prayed for, the possibility exists that the coverage provided by the above captioned policy may be exceeded.   This letter is

to advise you that you are at liberty to retain an attorney of your own choosing, at your own expense, to represent you on the amount which may exceed the coverage provided. If you desire to retain such attorney, please advise his name and address so that Mr. O'Brien can work closely with him in the mutual defense of this action.

"We will keep you advised of the progress of the case as it develops and should you have any questions, please do not hesitate to get in touch with our office." (Emphasis added.)

Gibson, however, had earlier retained I. James Heckathorn, a Kalispell attorney, as his personal lawyer in the matter. On November 23, 1976, Heckathorn had written to O'Brien stating that "[a]fter reviewing the matter with him, we believe the $75,000.00 settlement offer is not out of line." On behalf of Gibson, Heckathorn requested that the pending claim be settled within the policy limits.

On receipt of Heckathorn's letter, O'Brien had called Heckathorn on the telephone to discuss the case. Heckathorn had reviewed jury result handbooks, and felt that $75,000 was not unreasonable for the loss of an eye. He did demand that the claim be settled within the policy limits. O'Brien responded that he didn't feel that the settlement demand was reasonable in that they did not have a case of total loss of an eye, but one that was correctable by surgery.

In February and March 1977, depositions were taken of Frisnegger and of Dr. Larson, his personal physician. O'Brien established in Dr. Larson's deposition, that Dr. Larson was aware of no medical reason why Frisnegger could not be operated on and that after surgery Frisnegger's vision would be essentially normal and that he should not have any problem wearing contact lenses. The deposition of Dr. Gates, although scheduled for this period, was not taken by either party.

- 10 -

In May 1977, Hoyt made it clear that the $75,000 demand was an offer rather than an amount which he would suggest to his client as appropriate. Heckathorn was advised of the situation. Again O'Brien contended to Hoyt that his evaluation of the case was "significantly lower" than $75,000 and did not justify a settlement in that amount.

O'Brien was basing his position on two cases he had been involved with for total eye losses, one of which was settled for $18,000, and another which resulted in a verdict of $10,000 when the demand had been for $40,000. Beck had personal claim experience with an eye loss case in Idaho, where in a bar room brawl a complainant's eye had been displaced completely, and the resulting verdict was $35,000. No cases of significant similarity were found in the home office files of Western.

O'Brien also consulted with three members of his firm and two plaintiff's attorneys, Frank Morrison and Dale McGarvey in Kalispell. A significant psychological component to the claim was not discussed with the attorneys at that time. After discussion with the attorneys and on other considerations, O'Brien continued his opinion that the value of the case was in the $35,000 to $45,000 range.

O'Brien had raised the defense in his pleadings of mitigation by reason of avoidable consequences. Hoyt filed a motion to strike that defense which was by the court denied. On September 14, 1977, a pretrial conference was held. After the conference, Hoyt advised O'Brien that if the case were not settled at $75,000 by October 1, the offer would be withdrawn.

On September 27, 1977, an offer of $25,000 to settle the whole case was extended to Hoyt. On September 30, 1977,

Heckathorn made written demand upon O'Brien for settlement within the policy limits. In pertinent part, Heckathorn wrote:

"I have just concluded a conference with Dr. Gibson. John C. Hoyt contacted me and we reviewed the claim together. He feels very strongly that a jury will award more than $75,000. He pointed out that a person's eyesight is one of his most valuable possessions and he believes the defense is not taking a realistic look at the value of the claim.

"He also pointed out that there is no guarantee that corrective surgery will be effective. I discussed this matter with Dr. Gibson and Dr. Gibson wants to make it plain that the purpose for which he bought insurance was so that he would be protected against claims which could be settled within the limits of the policy.

"Dr. Gibson's claim can be settled within the limits of Dr. Gibson's policy and, on his behalf, we demand that settlement be made.

"In the event you and Dr. Gibson's insurance carrier disagree with our thinking and want to gamble on the basis that you have only $100,000 to lose and that any excess must be paid by Dr. Gibson, we want you to know that any such gambling will be at the risk of the insurance carrier and we will bring, on behalf of Dr. Gibson, a 'bad faith action' against the carrier.

"We are not attempting to tell you how to negotiate, or in what amount to settle, but we do want you to understand that failure to settle within the policy limits will be at your peril, not at the peril of Dr. Gibson."

Then came a significant development in the claim. On October 1, Hoyt called O'Brien to advise that a Missoula psychiatrist would testify to the effect that Frisnegger was having psychological problems relating to his injury and that Hoyt was going to add his name to the witness list for the trial which had been set for October 17, 1977. O'Brien made arrangements to have Frisnegger examined before the trial by Dr. Quint, a psychiatrist residing in Kalispell. Following the examination, Quint diagnosed Frisnegger's condition as a mild reactive depression. Dr. Quint had found that

Frisnegger suffered no loss of appetite, no inability to sleep, and no sexual dysfunction, the three hallmarks of depression.

In the meantime, on October 4, Hoyt had notified O'Brien that his new firm offer of settlement was $100,000. This offer remained open through the course of the trial to the jury verdict. However, O'Brien may have felt the settlement offer did not extend beyond the first day of trial because of a statement from Hoyt earlier that he did not leave open settlement offers once the trial had commenced.

During the trial, Dr. Walters, the Missoula psychiatrist, testified that Frisnegger was suffering from severe anxiety, with some symptoms of depression, and that if he did not receive help, a more serious type of depression might result, and suicide was not an impossibility. Much of this had been learned by O'Brien in the week before the trial, and although he communicated the information to Beck, O'Brien testified that he still did not feel it likely that the verdict would exceed $100,000.

At the trial, Dr. Larson testified that if the cataract were removed and a contact lens successfully used, Frisnegger's vision would be essentially normal. He admitted under cross-examination that there are psychological concerns, which usually do not appear until after surgery when the patient may have difficulty with contact lenses. Larson had not recommended surgery to Frisnegger. Walters testified in accordance with his earlier report, to the effect that Frisnegger suffered from severe anxiety and showed all the major symptoms of "reactive depression."

For the defense during the trial, Dr. Quint testified that he found a mild reactive depression. Dr. Gates was

called by the defendant on the second day of the trial and during his cross-examination, serious problems developed for the defense. Hoyt cross-examined Dr. Gates on an article by one Dr. Norman Jaffe, a textbook entitled, "Cataract Surgery and Its Complications." Dr. Gates was forced to admit that no complete physical examination of the plaintiff had been made to determine his overall status and suitability for cataract surgery and that there were in fact serious problems which could develop during and after cataract surgery.

The verdict was returned in the amount of $175,000.

Those are the essential facts leading up to the Frisnegger verdict. The judgment was entered thereon and eventually was sustained by this Court.

We turn now to the facts developed in the case at bar, Gibson's "bad faith action" against Western. At trial, to present expert testimony on insurance claims management, each party called two lawyers engaged in trial practice, and a claims manager of an insurance company. Merritt Warden and Marshall Murray, two Kalispell lawyers, testified on behalf of Western. Each had been given files relating to the Frisnegger claim and trial and each gave an opinion supportive of O'Brien and Western. Warden valued the settlement estimate of the claim at $30,000 to $40,000; Murray valued it at $40,000 to $60,000. Gary Olson, a claims manager for Liberty Mutual Insurance Company, was also called by Western and he placed an evaluation of $30,000 to $40,000 on Frisnegger's claim, and up to $60,000 based on Dr. Walter's testimony in the trial.

Gibson called on his behalf lawyers Bruce Toole of Billings, and William T. Boone of Missoula, and a claims manager, Erik Hallen. Because we must view the evidence in

the light favorable to the prevailing party, we will relate more on the testimony as it came from Gibson's witnesses.

Boone testified that Western failed in its duty properly to investigate the claim when it did not determine through medical examination whether Frisnegger was a suitable candidate for eye surgery. This failure was incompatible with the defense of avoidable consequences. Further the insurer failed to determine whether plaintiff's counsel intended to use medical textbooks and if so what textbooks in the examination of witnesses. Either a pretrial deposition of Dr. Walters, or interrogatories to him would have developed his testimony regarding reactive depression. Western had failed to develop facts before the trial relating to how the injury had effected Frisnegger's ability to lead a normal life, the effect on his job, his family, his recreational activities. With respect to evaluation, Boone could find no evidence in the insurance company file that it had valued the case at $45,000. Moreover, if the company had placed a $45,000 value on the claim, its agents did not communicate that to Mr. Hoyt. In Mr. Boone's opinion, if they valued the claim at $45,000, they had a duty to offer that amount in settlement and they had a duty to inform that they had done so to Gibson and his attorney. The prayer of the complaint against Gibson did not mention a total damage amount, and no attempt was made by the company before trial to determine the amount of damages actually being claimed by Frisnegger. The only offer made by the company before the trial was for $25,000. The failure of the company to offer $45,000 may have foreclosed a possible contribution by Gibson himself towards settlement. Boone had examined the case law that existed prior to the Frisnegger trial and had

found a large number of cases involving cataracts. He found cases ranging from a low of fifteen thousand to several hundred thousand dollars in compensatory damages and also cases where punitive damages were awarded. He found a "very wide range" of verdicts exceeding $100,000 in amount. Boone was of the opinion that the insurance company, in the light of all of the facts here, should have realized that there was a probability that the verdict would be rendered by a jury in excess of $100,000. He was of the opinion that the insurance company did not give at least equal consideration to the interests of its insured, Gibson. Boone further testified that there should have been some communication during the trial between O'Brien and the insurance company when the case started going badly.

Toole testified in effect that Western placed too much reliance on the efficacy of the defense of avoidable consequences. Western took a "dogmatic view" that there was no question that its defense of avoidable consequences would be sustained. No attempt was made by Western or its counsel to evaluate what a jury might do, if it concluded that Frisnegger did not have an absolute duty to have his eye repaired; "[t]hat was going to be a fact question for the jury." Western should have evaluated the case as it neared trial with the options in mind respecting the possibility of the jury accepting or not accepting the affirmative defense. There was no attempt to memorialize in the file, by memorandum or letter, any analysis as to the evaluation placed on the Frisnegger claim by Western. The $25,000 settlement itself was not evaluated. Beck's evaluation is not explained nor do any analyses appear in the file by defense counsel. Industry standards would require a careful

analytical opinion of the components of the lawsuit, and an estimate of their possible liability in the various aspects of damages and what the options were. This was never done in the Frisnegger claim by Western or its counsel. If the case had been properly evaluated, the attention of somebody would have been brought to the fact that the case had a "greater potential" for large damages. This was a case of admitted liability, with an eye injury about which the jurors might tend to be squeamish. It involved a patient who, undergoing a very simple procedure, "ended up with a bad eye" and so might have some real questions about having any more work done on his eye. No mention is made in the company files or letters concerning the Frisnegger claim of the ability or skill of the opposing attorney. According to Toole's testimony, these facts tended to indicate a potential for larger damages.

Toole further testified that because the insurance company occupied a fidiciary position with respect to its insured, Gibson, it had a duty to put out its "top dollar" in the settlement negotiations. Even though the attorney retained by the insurance company is receiving his fee from the insurance company, his primary duty is to the insured. On that basis, Toole testified, if the doctor has a desire to have the case filed against him out of town, and this is possible, he should be consulted about that possibility by the attorney representing the insurance company. Toole testified that in his opinion a prudent insurance company facing the same situation as Western would have settled the Frisnegger case within the policy limits and it was his further opinion that there was a significant likelihood that

this case was going to go over the limits and invade the doctor's assets.

The opinion of Gary Olson called by Western in its case, was that as a regional claims manager, he would have placed a value on the Frisnegger claim between $30,000 to $40,000 before trial. Erik Hallen testified, on behalf of Gibson, based on his expertise as a regional claims manager, that there was incomplete documentation in Western's file with respect to the claim and that nothing in the file indicated that Western had ever made any evaluation of the claim.

From this rather full exposition of the facts, we turn our attention now to relate those facts to the elements suggesting bad faith, set out in Jessen v. O'Daniel (D. Mont. 1962), 210 F.Supp. 317.

Keeping in mind Western's contention that the jury verdict in this case was not based on sufficient evidence, in light of appropriate and accepted standards, we inquire first whether there was a likelihood of a verdict greatly in excess of the policy limits. The appellate rule of review is that if substantial evidence in the record supports a jury verdict, it must be sustained. Western is hardly in a position to raise appropriate and accepted standards in this case; the record is positive that never before the trial did it evaluate the Frisnegger claim from the viewpoint that the defense of avoidable consequences might not be sustained. The testimony of Boone, Toole, and Hallen supports the possibility of a verdict exceeding $100,000, and in Toole's case, establishes a significant possibility of such a result. Western argues now that no witness testified that the verdict would be "greatly in excess" of the coverage limits. The range of possible verdicts based on other cases, testified to

by Boone and Toole, reveals possible verdicts several hundred thousand dollars in excess of the coverage limits here. It is clear from the record here that Western did not take into account the likelihood of a high verdict but rather relied on a somewhat limited field of experience involving three or four cases. We hold that a verdict greatly in excess of the policy coverage limit was likely, as shown by substantial evidence.

In Mr. Toole's words, had a proper investigation and a written evaluation based on the factors facing the company in this claim been done, the value of the claim would have "jumped out" at Western's representatives.

The second *Jessen* factor is whether a defendant's verdict on liability is doubtful. Here Gibson, by his own admission, was at fault for the injury to Frisnegger. There was no issue as to liability.

The third *Jessen* factor is whether the company has given due regard to the recommendations of its trial counsel. That factor has no application here. Although trial counsel had apparently valued the claim at $35,000 to $45,000, there is no file documentation of this evaluation. It is especially evident that the offer of $25,000 which was actually made before trial came not from trial counsel, but from the company itself, upon a basis not set forth in the company's files.

The fourth factor is whether the insured has been informed of all settlement demands and offers. Gibson and his attorney were informed of the $75,000 offer that had been made by Hoyt. They were also informed of the $25,000 counter-offer that had been made by Western. They had been given no information, certainly not in writing, that the

- 19 -

company placed a $45,000 value on the claim. As far as Gibson was concerned, there was until October 1, 1977, an offer from Frisnegger of $75,000; after October 1, 1977 an offer of $100,000; and from the company, in either case of $25,000. Both Toole and Boone testified that the insurer had a duty to put the $45,000 "on the table" to see if there would be any movement toward settlement from Hoyt.

There is a conflict in the evidence as to whether O'Brien discussed with Gibson the possibility that the Frisnegger claim might be filed in a county other than Flathead County, where Gibson resided and practiced. It was Toole's opinion, by virtue of the fidiciary relationship existing between the company and Gibson, that he should have been made aware of this possibility and his decision should have been considered as to the place of trial.

The fifth Jessen factor is whether the insured has demanded that the insurer settle within policy limits. That can not be disputed here. Gibson's attorney clearly told the insurer that if it failed to settle the case within the policy limits it was "gambling" at its own risk.

The sixth factor is whether any offer of contribution had been made. In this case no contribution offer had been made by Gibson. Ordinarily we would conceive that an insurance company could not properly request that the insured make a contribution when the offer of settlement is within the policy limits. That does not foreclose the issue, however. As both Toole and Boone testified, if the $45,000 evaluation had been offered to Frisnegger, the gap between the settlement demand of $75,000, and the offer of $45,000 would have been considerably narrowed. In that situation Gibson might well have considered making a contribution

toward settlement. This case, however, is one where no offer of contribution was made by Gibson. The sixth _Jessen_ factor is not applicable to this case.

Those are the _Jessen_ factors. As the Court said in _Jessen_, no one factor is decisive, and all of the circumstances must be considered as to whether the insurer acted in good faith. The jury found by special verdict that Western was guilty of bad faith in the handling of the claim, and we hold that the evidence fully supports the jury verdict. The failure of Western through its agents to follow established standards of investigation, evaluation, negotiation, and communication with its insured are the deciding factors upon which we base this conclusion.

II.

Excessive Compensatory Damages; Sufficiency Of The Evidence To Support Damages

After judgment was entered on the verdict, Western moved the District Court for a new trial on the ground that the verdict granted excessive damages appearing to have been given under the influence of passion and prejudice. As an alternative, Western moved to alter or amend the judgment by striking all consequential damages in excess of $83,750.

The District Court denied both motions.

Western contends on appeal that in this case Gibson had $83,750 in actual damages, the sum he had to pay to procure satisfaction of the Frisnegger judgment. Western contends that the remainder of the $250,000 compensatory award, $166,250, was based solely on the purported inconvenience and frustration of litigation suffered by Gibson and that the remainder of the compensatory award is without adequate foundation as to amount and so must be reduced.

Under section 25-11-102(5), MCA, a party may move for a new trial at the District Court level on the ground that excessive damages have been granted under the influence of passion or prejudice of the jury. The rule established in Ashley v. Safeway Stores, Inc. (1935), 100 Mont. 312, 47 P.2d 53, is that a jury award of damages will not be overturned unless it shocks the conscience of the court.

When a motion for new trial is pending before a district court on the ground of excessive damages, it is guided by the rule set out in Kelley v. John R. Daily Company (1919), 56 Mont. 63, 181 P. 326: excessiveness of verdict is not in itself a ground for the grant of a new trial. It is only when the excessive damages appear to have been given by the jury under the influence of passion or prejudice that a new trial may be granted; in every case a wide latitude is allowed for the exercise of the judgment of the jury and unless it appears that the amount awarded is so grossly out of proportion as to shock the conscience, a court cannot substitute its judgment for that of a jury. When the order of the District Court denying a new trial on the ground of excessive damages is reviewed at the appellate level, where the evidence is substantial, though conflicting, the order will be sustained in the absence of any showing of abuse of discretion by the District Court. Pfau v. Stokke (1940), 110 Mont. 471, 103 P.2d 673.

Although an action against an insurer for a breach of its implied covenant of good faith and fair dealing towards its insured sounds in contract the action is to be regarded as one for tort. See Crisci v. Security Insurance Company (1967), 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173; Comunale v. Traders & General Insurance Company (1958), 50

Cal.2d 654, 328 P.2d 198. The statutory rule for measure of damages in tort cases is the amount which will compensate the injured party for all the detriment proximately caused thereby, whether it could have been anticipated or not. Section 27-1-317, MCA.

In French v. Ralph E. Moore, Inc. (Mont. 1983), 661 P.2d 844, 40 St.Rep. 481, we held that damages for mental anguish, including emotional distress, are recoverable in a negligence action. It is clear to us that the statutory allowance for recovery of damages for all detriment proximately caused by the insurer in this type of case would allow recovery for amounts other than simply the amount of the excess judgment, as for example, economic loss and emotional distress. See Larraburu Brothers, Inc. v. Royal Indemnity Company (9th cir. 1979), 604 F.2d 1208; Crisci, supra.

The District Court in this case properly instructed the jury with respect to compensatory damages, including cautionary instructions. It told the jury that it could determine the amount of damages from the evidence presented pursuant to the instructions; that it could consider reasonable compensation for any embarrassment, fears, anxiety, and other emotional distress suffered by Gibson and for similar future distress reasonably certain; that no definite standard or method of calculation is prescribed by law for fixing damages for emotional distress, but that the jury should exercise calm and reasonable judgment in fixing the same; that damages in all cases must be reasonable; and that mere speculation cannot be a basis for recovery.

There is no doubt that Gibson sustained $83,750 in out-of-pocket damages. The remainder of the $250,000 compensatory award, Western contends, is based only on the

inconvenience and frustration of litigation, suffered by Gibson, although Western recognizes that the trial undoubtedly had an effect upon him.

Gibson testified that when the Frisnegger trial came on, he was not ready for the publicity. He was despondent, angry and felt betrayed when the large verdict was returned against him. After the verdict, only four or five physicians in the Kalispell area expressed any regret to Gibson. Some optometrists or physicians discontinued referrals to Gibson. As a result of the lack of support from his peers, his professional enthusiasm lessened.

Mrs. Gibson testified that her husband was very "uptight" following the damage to Frisnegger's eye. As the trial approached, he became tense, could not sleep and was not patient with the children. After the trial, he was depressed and lacked energy and this affected their marital relationship. Professional counseling was sought, but the problems resolved themselves.

Recently we permitted the recovery of damages for mental anguish in wrongful death cases. Dawson v. Hill & Hill Truck Lines (Mont. 1983), 671 P.2d 589, 40 St.Rep. 1689. Emotional or mental distress is an aggravation of damages when it naturally follows from a tort. When emotional distress is a factor in the detriment sustained, there is no reason why an award for such damages may not be given by a jury. There is no precise yardstick by which an appellate court can measure the propriety of a jury award for such damages.

The mental distress of a professional person fearing that his professional reputation has been damaged, and the stress of disruption of his home and professional life are elements for a jury to measure, seeing the witnesses and

hearing the evidence. Here the evidence and testimony relating to emotional distress were straightforward. No attempt was made to expand the record for purposes of gaining sympathy for Gibson or creating passion against Western. The district judge saw no reason to grant a new trial on this ground. We see no abuse of discretion and find no reason to disturb the decision of the jury on its award of compensatory damages.

III.

Punitive Damages; Sufficiency of the Evidence to Support Punitive Damages

The jury awarded $300,000 in punitive damages against Western and in favor of Gibson. Western recognizes that we have recently held that punitive damages may be assessed in an insurance bad faith case, Lipinski v. Title Insurance Company (Mont. 1982), 655 P.2d 970, 39 St.Rep. 2283, but argues that here the punitive award is unsupportable.

The main thrust of Western's contention on this issue is that there is in the evidence no showing of an intentional wrongdoing or a desire to injury Gibson, nor any illegal withholding of the benefits of his malpractice policy. They contend that the actions of the company claims managers and of its counsel do not show the requisite intent to harass or harm, nor the unjustifiable or reckless conduct needed to sustain an award of punitive damages. They contend that affirmance of the punitive damages award will be a message to the insurance industry that they may not rely on the best efforts of experienced trial counsel and adjusters and should they refuse a demand within policy limits, they face the specter of six figure exemplary damages, regardless of the character of the conduct.

Gibson, on the other hand, contends that Western unreasonably failed to investigate, evaluate or negotiate the claim in good faith or properly to prepare for trial; and that Western intentionally failed to disclose matters of material interest to its insured, including the offer to file the case in another county and the failure to disclose the fact that it had placed a valuation of $45,000 on the case which was never offered for settlement.

In First Security Bank v. Goddard (1979), 181 Mont. 407, 423, 593 P.2d 1040, 1049, we said:

> ". . . The office of an award of exemplary damages is to punish the defendant for malicious and wrongful acts, be the malice actual or presumed, where the defendant should suffer some additional penalty for the wrongful conduct and where the exemplary damages will serve as a warning to others and as a deterrent and punishment to the defendant."

Exemplary damages are allowed where the defendant has been guilty of oppression, fraud or malice, actual or presumed. Section 27-1-221, MCA. We have defined presumed malice to include unjustifiable conduct. Goddard, supra. Recently in Owens v. Parker Drilling Company (Mont. 1984), 676 P.2d 162, 164-65, 41 St.Rep. 66, 69, we explained the term "unjustifiable" saying:

> "When a person knows or has reason to know of facts which create a high degree of risk of harm to the substantial interests of another, and either deliberately proceeds to act in conscious disregard of or indifference to that risk, or recklessly proceeds in unreasonable disregard of or indifference to that risk, his conduct meets the standard of willful, wanton, and/or reckless to which the law of this state will allow imposition of punitive damages on the basis of presumed malice.
>
> "This standard is more definitive and perhaps more stringent than those of the past. Certainly the 'unjustified conduct' measure was extremely broad and difficult to apply. We also emphasize that substantial interests must be implicated so that an intentional or reckless disregard of duties that do

not protect substantial interests, does not give
rise to punitive damages. The standard, in
substance, is supported by Restatement of the Law,
Torts 2d section 500, comment a."

The instructions show that the court was careful to state that punitive damages are extraordinary and shall be given only when the conduct of the defendant deserves such special treatment; that a plaintiff is never entitled to punitive damages as a matter of right; and that the acts complained of must not only be unlawful, but must also partake somewhat of a wanton nature.

From the testimony in this case the jury could have found that Western was at least recklessly indifferent to the risk to which it was putting Gibson so that consideration of punitive damages was a proper issue to submit to the jury. We find no reason to state that as a matter of law punitive damages should not have been awarded in this case.

Western raised in the District Court the question of whether the punitive damages were excessive. That same question is not presented directly here although Western submits that the punitive damage award should be "properly vacated or significantly reduced to an amount more in keeping with its function . . ."

To perform its office as a deterrent, punitive damages when awarded should be of such a significant amount as will serve the office of deterrence by punishing the defendant and as will warn others. Thus the wealth of a defendant is a fact in issue where punitive damages are involved. An exhibit in this case shows that Western's net worth or surplus in 1981 was $122,198,665. Its annual net income for 1981 was $13,962,915 after taxes. In those circumstances an

award of $300,000 punitive damages is not enough to shock the conscience.

IV.

Concealment of Material Facts by a Fiduciary; Instructional Error

The final issue raised by Western on appeal was whether the trial court erred in giving its court's instruction no. 7 as follows:

> "An insurance company is subject to liability for bad faith if it intentionally conceals material facts within its knowledge and not known by its insured."

Western contends that the instruction was taken from pattern instructions on fraud and that to insert the term "bad faith" for the term "fraud" takes the instruction out of context. Western further contends that failure of communication is not a part of the disclosure requirements of Jessen, supra.

The first interrogatory given to the jury was "Did defendant act in bad faith toward Plaintiff in the prior case?" Western contends that on the strength of instruction no. 7, the jury was mandated to answer the question in the affirmative.

Western also contends that instruction no. 7 led to the award of punitive damages because of court's instruction no. 31 which stated:

> "Punitive damages may be awarded to an insured for breach of duty owed to its' insured. If it is found that Western Fire Insurance Company acted in bad faith, punitive damages may be awarded independent of breach of contract and independent of violation of statute."

Gibson responds that the fiduciary relationship imposes a duty upon the fiduciary to speak rather than remain silent and to disclose information to the beneficiary with whom he

- 28 -

is dealing so as to place the beneficiary on an equal footing with the fiduciary. Lyle v. Moore (1979), 183 Mont. 274, 599 P.2d 336.

The duty of a fiduciary to his beneficiary is no less than that of a trustee. The fiduciary, as a trustee, is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. Section 72-20-201, MCA. Court's instruction no. 7 must be read in the light of that duty. It is therefore not error to inform the jury that an insurance company which "intentionally" conceals material facts within its knowledge and not known by its insured may be found in bad faith. Jessen, supra. The facts which are concealed must be material to the subject of the trust or the duty of the fiduciary, as the instruction stated.

Western does not contend that instruction no. 31 itself is a misstatement of the law. Rather it contends that instruction no. 31 coupled with instruction no. 7 mandated the punitive damage award.

Instruction no. 31, however, was not the sole instruction given to the jury on the subject of punitive damages. We have already quoted in this opinion excerpts from some of those instructions. Instructions should be weighed as a whole, and no District Court may be reversed where the instructions, read one with another, and in context

with each other, fully define the issues involved, including damages. We find no error in the instructions on punitive damages when read as a whole.

V.

The judgment of the District Court is affirmed in all respects.

_John C. Shechy_
Justice

We Concur:

_Frank J. Haswell_
Chief Justice

_Daniel J. Shea_

_Justices_

_John Conway Harrison_

_Justices_

Hon. Gordon Bennett,
District Judge, Sitting
for Mr. Justice Frank B.
Morrison

- 30 -