No. 14931

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

FIRST TRUST COMPANY OF MONTANA,
Personal Representative of the
Estate of Jack W.Sisson, Decedent,

Plaintiff and Appellant,

vs.

LYLE McKENNA,

Defendant and Respondent and
Cross-Appellant.

---

Appeal from: District Court of the Tenth Judicial District,
Honorable LeRoy L. McKinnon, Judge presiding.
In and For the County of Judith Basin

Counsel of Record:

For Appellant:

Swanberg, Koby, Swanberg and Matteucci, Great Falls,
Montana
Randall Swanberg argued, Great Falls, Montana
GORHAM E

For Respondent:

Robert J. Emmons argued, Great Falls, Montana
Leonard McKinney, Lewistown, Montana

---

Submitted: March 28, 1980

Decided: JUN 17 1980

Filed: JUN 17 1980

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

In an action by the sellers of a farm to recover a real estate commission and treble damages, the District Court granted summary judgment in favor of the real estate broker and dismissed the broker's counterclaim for malicious prosecution. Both parties appeal from the respective judgments against them.

In 1970 Jack Sisson and his brother Mark owned a ranch in Judith Basin County, Montana. The ranch consisted of about 8,400 acres of deeded land and about 6,320 acres of leased land together with livestock, machinery and improvements. The defendant was at all times pertinent to this case a licensed real estate broker. In October 1969, the Sissons executed a real estate broker's contract authorizing the defendant to sell the Sissons' real property for $800,000. The defendant was unable to complete a sale and the contract expired on May 1, 1970. The Sissons thereafter had the ranch listed with two or more other real estate brokers, but no sale was consummated at that time.

On about December 6, 1972, the Sissons again sought defendant's services in selling the ranch. Defendant sought another broker's contract but was unsuccessful. He did, however, begin looking for a purchaser and determined that an area rancher, Bill Skelton, was interested in purchasing the real property only for $700,000. Without informing the Sissons of Skelton's interest in the land, the defendant attempted to persuade the Sissons to separate the livestock and machinery from the real estate for separate sale. The Sissons declined because they wanted a single sale.

On or about December 14, Floyd Hicks, a cattle buyer, expressed an interest to the defendant in purchasing the

-2-

cattle and machinery. Bill Skelton was apparently still interested in buying just the land at this time for $700,000. Defendant then approached the Sissons and apparently left them with the impression that Hicks wanted to buy the entire ranching operation for $900,000. The reason defendant did not tell the Sissons that Hicks was only interested in the cattle and machinery and that Skelton was to put up the money for the land was given in the following testimony of defendant broker:

"Q. Did they know who the buyer was? A. No.

"Q. Was there a reason why you did not tell them who the buyer was? A. Yes.

"Q. What was the reason? A. Well, Jack Sisson had fights with all his neighbors. When I had the place sold to Sanmeyer, he refused to go because he didn't like Sanmeyer. I knew the same thing would happen if I told him who the buyer was, so I didn't tell him the buyer. The buyer was a very good buyer, substantial money, good backing, but for personal reasons, Jack wouldn't have sold, probably--that is my surmise."

On December 18, the Sissons told defendant that they would sell to Hicks for $900,000. Defendant and Hicks went to the Sisson ranch, and a purchase agreement was drawn up but not signed. Defendant and Hicks then went to Skelton's ranch and discovered that Bill Skelton was beginning to change his mind about buying the entire Sisson ranch. The Sissons, in the meantime, discussed the proposed sale with their accountant, who suggested that the sale price be allocated $675,000 for the land and $225,000 for the personal property. The Sissons contacted the defendant and a new purchase agreement was prepared on December 20 pursuant to the accountant's advice. Hicks was not present at this meeting, but he had given defendant $20,000 earnest money for a deposit on the property. The Sissons signed the agreement at this time.

On December 21 defendant again visited the Sissons. By this time defendant knew that Bill Skelton was no longer interested in purchasing all of the Sisson land. During the visit, the defendant informed the Sissons that Hicks could not handle the deal alone and that defendant would have to go in with Hicks. Defendant also informed the Sissons, during this visit, that he wanted five separate deeds so that the ranch could be resold in parcels. On December 29, the Sissons, Hicks, and defendant met; the buy and sell contract was signed; and the earnest money was paid.

The District Court found that throughout the time defendant was attempting to sell the ranch, he was in contact with several neighbors and that some of these neighbors were interested in buying parcels of the ranch. The District Court also found that defendant had not made any deals to resell the parcels until after the closing date on December 29, 1972.

Within eleven days from the date when the defendant and Hicks bought the ranch, the land was resold in parcels for $800,000. The cattle, hay and equipment were eventually resold for $279,657.39. This resulted in a $179,657.39 profit for defendant and Hicks. In addition, defendant earned a commission on the sale of $45,000.

The amended complaint alleges that defendant breached his fiduciary duty by failing to disclose to the Sissons the fact that he had been conducting negotiations to resell the parcels and that defendant had violated certain statutes governing the conduct of real estate brokers. Defendant's answer, among other things, included a counterclaim for malicious prosecution. During the pendency of the actions, Jack Sisson died and the First Trust Company of Montana, the

personal representative of his estate, was substituted as plaintiff in the action.

Both parties moved for summary judgment. The District Court issued findings of fact, conclusions of law, and judgment denying plaintiff a summary judgment and granting defendant a summary judgment. Additionally, the District Court granted plaintiff's motion for dismissal of defendant's counterclaim. Plaintiff appeals from the summary judgment against it, and defendant cross-appeals from dismissal of his counterclaim.

The plaintiff has listed several issues which may be summarized as follows:

1. Did the District Court err in granting summary judgment in favor of the defendant?

2. Did the District Court err in dismissing the malicious prosecution counterclaim for failing to state a cause of action?

Rule 56(c), M.R.Civ.P., provides that summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In the present case the District Court granted defendant's motion for summary judgment because the court concluded there was no issue of material fact as to the breach of any duty by the defendant. In this connection, the District Court also concluded that defendant had acted in good faith in his dealings with the Sissons. Obviously, the District Court felt that the duty a broker owes to his principal is a duty of good faith and that defendant did not breach his duty.

In the recent case of Lyle v. Moore (1979), ___ Mont. ____, 599 P.2d 336, 36 St.Rep. 1307, this Court had occasion

to consider the duty of disclosure which a broker owed to his principal. That case involved a clause in a broker's agreement which said, among other things, that the broker was entitled to a commission if the defendants withdrew the broker's authority to sell before a certain date. The defendants withdrew the authority before that date and the plaintiff sued for his commission. The defendants claimed they did not understand the terms of the contract. The District Court held that this did not excuse the defendants and gave judgment for plaintiff. This Court reversed, finding that the plaintiff had failed in his duty to explain the provision granting the broker his commission if the defendants withdrew his authority prior to a specified date. This Court said, "[i]n Carnell v. Watson (1978), [176 Mont. 344] 578 P.2d 308, 312, 35 St.Rep. 550, 555, we recognized a fiduciary relationship between a real estate broker and his client. This fiduciary relationship between a broker and his client has been found to encompass a 'duty of full disclosure' by a number of courts." 599 P.2d at 337. We went on to say:

> ". . . there are times when the law imposes a duty upon a party to speak rather than remain silent and thereby to disclose information to place the person with whom he is dealing on an equal footing with him. The failure to speak in such a case amounts to the suppression of a fact which should have been disclosed and constitutes fraud." 599 P.2d at 339. (Citations omitted.)

A broker has a duty to act in good faith toward his client. Embodied within this duty is a requirement to make full disclosure. This duty to disclose all pertinent facts becomes particularly important where the broker is himself buying the property. See Crowley v. Rorvig (1921), 61 Mont. 243, 203 P. 496.

This principle is set forth in Comment A to Restatement of Law, Agency 2d, Section 390, in the following language:

". . . Before dealing with the principal on his own account, however, an agent has a duty, not only to make no misstatements of fact, but also to disclose to the principal all relevant facts fully and completely . . ."

12 Am.Jur.2d Brokers §91 at 844 states:

"The general rule is that a broker can neither purchase from, nor sell to, his principal unless the latter expressly assents thereto or, with full knowledge of all the facts and circumstances, acquiesces in such transaction. Moreover, even though the principal gives his assent to a purchase or sale by the broker, the latter's actions throughout must be characterized by the utmost good faith. In the event of any litigation between him and his employer, the burden is upon him to prove both the permission and the exemplary manner in which he availed himself of it. The reason is that it is inconsistent for one to act as a principal in his own behalf while is duty bound to act as the agent of another, for in the latter capacity he is bound to exercise his best skill and labor and a high degree of fidelity and good faith to secure for his principal the best bargain possible, even though his own conflicting interests at the same time impel him to do just the opposite and thereby gain the most advantageous terms for himself."

In the present case, defendant orally agreed to buy the land on December 21, 1972. On December 29 the papers were signed and a check was given to the Sissons. Defendant testified that on December 22 he offered the entire ranch to Henry Wortheimer for $950,000. Wortheimer later declined the offer. Defendant did not inform the Sissons that this offer was outstanding. He testified:

"Q. Why did you not tell them? A. Well, we made a deal to buy on the 20th, as far as I was concerned, and it was sold on the 20th. It was now my obligation to try to pick up the pieces. I was in a position I had to deal for myself."

Defendant also testified that he had contacted Ray Hill on December 23 and Hill had indicated an interest in purchasing a parcel of the ranch; that he had contacted Bill

Skelton on December 20th and Skelton indicated an interest in purchasing a portion of the ranch; that he contacted Eloise Reed on about December 27 and she was not interested. On December 27, Bill Skelton gave defendant a purchase agreement for a portion of the ranch. Defendant did not inform the Sissons of these facts.

In addition, defendant told the Sissons that Hicks was going to buy the ranch for $900,000 when in truth Hicks merely wanted to buy the cattle, hay, and machinery for $200,000 and the land was to be sold for $700,000 to Bill Skelton. Defendant did not tell Jack Sisson that Skelton was a potential buyer because he was afraid that Jack Sisson would not agree to the sale if he knew that Skelton was involved.

Defendant argues that he had no duty to disclose after December 21 because that was the day when the agency relationship came to an end. He argues that the agency relationship ends when a broker earns the commission and the commission is earned when the broker produces a ready, willing and able buyer for the property. Therefore, according to defendant, he no longer had a duty to disclose after he produced himself and Hicks as ready, willing and able buyers on December 21.

Defendant is correct in one respect. Montana cases have repeatedly stated that a broker is entitled to his commission when he produces a ready, willing, and able buyer. In Diehl & Associates, Inc. v. Houtchens (1977), 173 Mont. 372, 567 P.2d 930, this Court said:

> "It is a generally accepted law that a real estate broker is entitled to commissions when he has, in pursuance of his employment and within the time specified in the contract of employment, procured a purchaser able, ready

and willing to purchase the seller's property on the terms and conditions specified in the contract of employment. Roscow v. Bara, 114 Mont. 246, 135 P.2d 364; 12 Am.Jur.2d 921, Brokers §182. When the broker procures a buyer who makes a counteroffer or agrees to terms at variance to the terms specified in the employment contract, the seller has the option of accepting or rejecting the counteroffer. If the seller accepts the counteroffer of the procured buyer, the seller is legally obligated to pay commissions to the broker, either under the terms of the contract of employment or the mutually agreed terms of a contract for sale.

"The broker's ability to recover commissions is premised on the broker's ability to accomplish what he undertook to do in his contract of employment . . .

". . .

"We note the distinction between a brokerage contract which requires a broker to merely find a purchaser and a brokerage contract which requires a broker to sell, make or effect a sale. In the first case the broker earns his commission when he procures a buyer able, ready and willing to purchase on the seller's terms. A broker employed to sell or effect a sale does not earn his commission until he completes the sale. Completion of the sale, where real property is involved, amounts to payment of the purchase price and conveyance of title. O'Neill v. Wall, 103 Mont. 388, 62 P.2d 672." 567 P.2d at 933-35.

See also Hollinger v. McMichael (1978), ___ Mont. ____, 580 P.2d 927, 35 St.Rep. 856, and Apple v. Henry (1923), 66 Mont. 244, 213 P. 444.

It must be noted, however, that in each of the above-cited cases, the issue was whether the broker was entitled to a commission, not whether the broker had a duty to disclose relevant facts to the principal, and in none of the cases was the broker the prospective buyer. A close reading of these cases reveals that the rule of law set forth therein is to protect a broker who has produced an eligible buyer. These cases do not stand for the proposition that a broker is released from a duty to disclose as soon as he proposes to buy the land for himself.

Here defendant was not legally bound to buy the property on December 21, 1972, the date that defendant and Hicks orally offered to buy the property for $900,000 and the Sissons orally accepted the offer. Defendant was not legally bound to buy the land until December 29 when the written contracts were signed. He could have backed out at any time. It was during this time that the defendant made several contacts concerning the property and did not tell the Sissons about the contacts.

Research has not revealed a Montana case which is directly on point. We note, however, the case of Irby v. Lee (Okla.App. 1973), 512 P.2d 253, which presented a similar fact situation. In Irby the defendant was a broker who had been trying to sell the plaintiff's land. On April 14, 1969, the broker told the plaintiff that he, the broker, would buy a portion of the land. On April 30, 1969, the broker entered into a contract with a third party to sell the portion of land that the broker had bought. This was not disclosed to the plaintiff seller. In May the plaintiff received money for the land and conveyed the land to the broker. The court was presented with the issue of whether a fiduciary relationship still existed on April 30, the day the broker contracted to sell to a third party. The court held that the fiduciary relationship did not expire until May, when the broker paid the plaintiff for the property. The reasoning used by the court was that the broker was not legally bound to buy the property until May and he was, therefore, still under a duty to disclose on April 30.

We follow the same rationale and hold that defendant had a duty of full disclosure until he was legally bound to buy the property on December 29, 1972. This holding com-

ports with the high standards applicable to brokers buying property from a principal. However, this does not automatically entitle plaintiff to summary judgment. The case presents genuine issues of material fact as different inferences can be drawn from the facts as to whether the defendant breached his duty. Consequently, the summary judgment in defendant's favor is vacated and the case is remanded to the District Court for trial.

Plaintiff has alleged that the District Court erred in not finding that defendant violated certain sections of Montana's Real Estate License Act. At the time this action arose, the pertinent statute was found at section 66-1937, R.C.M. 1947, and has since been amended. Those amendments, however, do not change our disposition of the case. In particular plaintiff cites section 37-51-321, MCA, which provides in pertinent part:

> "Revocation or suspension of license--initiation of proceedings--grounds. The board may on its own motion and shall on the sworn complaint in writing of a person investigate the actions of a real estate broker or a real estate salesman, subject to 37-1-101 and 37-1-102, and may revoke or suspend a license issued under this chapter when the broker or salesman has been found guilty by a majority of the board of any of the following practices:
>
> ". . .
>
> "(3) pursuing a continued and flagrant course of misrepresentation or making false promises through agents or salesmen or any medium of advertising or otherwise;
>
> ". . .
>
> "(9) offering real property for sale or lease without the knowledge and consent of the owner or his authorized agent or on terms other than those authorized by the owner or his authorized agent;
>
> ". . .
>
> "(19) demonstrating his unworthiness or incompetency to act as a broker or salesman . . ."

The District Court made no findings concerning these statutory provisions. Because there is conflicting evidence which presents a genuine issue of material fact, this issue can be determined at the trial.

Defendant has appealed from dismissal of his counterclaim. The counterclaim is based on an allegation of malicious prosecution. The trial court dismissed this counterclaim for failing to state a cause of action.

In actions for malicious prosecution the party bringing the action must prove that there has been a termination of proceedings. This rule has been stated as follows:

> ". . . On the other hand, an action for malicious prosecution may not be asserted by way of cross-complaint or counterclaim in the original proceeding, prior to its termination, since it is essential that the original proceeding shall have been previously terminated in favor of the party bringing the malicious prosecution action. Hence a counterclaim purporting to set forth the cause of action in malicious prosecution is properly dismissed as premature . . ." (Emphasis added.) 52 Am.Jur.2d Malicious Prosecution §14 at 195.

In Bollinger v. Jarrett (1965), 146 Mont. 355, 406 P.2d 834, this Court said:

> "It is also contended that it was error for the court to render summary judgment against appellant-buyer's counterclaim. The basis of the counterclaim was that the sellers' action wrongfully injured the credit standing of the buyers. The only possible grounds for such a claim are libel and malicious prosecution, neither of which can be sustained here. There is no libel because any publication in a judicial proceeding is privileged under R.C.M., 1947, 64-208. And malicious prosecution founded on a civil action is not the proper subject of a counterclaim since it requires proof of termination of the former proceeding in favor of the defendant therein. Baker v. Littman, 138 Cal.App.2d 510, 292 P.2d 595; 54 C.J.S. Malicious Prosecution §54, P. 1021." (Emphasis added.) 406 P.2d at 837.

For this reason the dismissal of defendant's counterclaim was proper.

Affirmed in part and reversed in part. The summary judgment in defendant's favor is vacated and the cause remanded to the District Court for trial.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

Mr. Justice John C. Sheehy:

I dissent.

_____
Justice

-13-