[712 NYS2d 19]

Elizabeth M.R. Dubbs et al., Appellants-Respondents, v Stribling & Associates et al., Respondents-Appellants.

First Department, July 27, 2000

### APPEARANCES OF COUNSEL

*Edward J. Guardaro, Jr.,* of counsel (*Thomas A. Dubbs* on the brief; *Goodkind Labaton Rudoff & Sucharow, L. L. P.,* attorneys), for appellants-respondents.

*Steven M. Nachman* for respondents-appellants.

### OPINION OF THE COURT

FRIEDMAN, J.

A real estate broker who, after complying with disclosure requirements, contracts to purchase her client's apartment does not owe a continuing fiduciary duty to the client after the contract date. This action, which is rooted in a claim that defendants breached fiduciary duties to their client after execution of the contract, was therefore properly dismissed by Supreme Court.

Plaintiffs, both of whom are lawyers, were the owners of apartment 3-C in a building located at 139 East 94th Street in the Carnegie Hill section of Manhattan. Seeking more space, and knowing that the C-line and D-line units in the building could be combined, they contacted their next door neighbor in apartment 3-D, Nancy Kelly, to find out if she was willing to sell them her unit. Kelly, however, told plaintiffs that she was unwilling to sell.

In mid-1994, plaintiffs listed their apartment for sale with defendant, broker Stribling & Associates (Stribling). When listing the apartment plaintiffs advised Stribling, via its salespeople, defendants Judith Durham and Avery L. Chappell-Smith, that their apartment could be combined with apartment 3-D and how such a combination could be effectuated. They also advised Stribling that they would have preferred to remain in their apartment, purchase apartment 3-D, and combine the two, but their neighbor was unwilling to sell.

Chappell-Smith, acting for Stribling, made several attempts to arrange the sale of plaintiffs' apartment but she was unsuccessful. Then, in October 1994, she brought her husband to see it. The next day Durham called plaintiffs on behalf of Stribling and informed them that the Smiths (that is, Chappell-Smith and her husband) sought to purchase the apartment on their own behalf and that all commissions would therefore be waived.

It is uncontroverted that before any contract was signed Durham told plaintiffs that they should attempt to purchase the Kelly apartment if that was still their desire. It is also uncontroverted that plaintiffs again approached their next door neighbor, Kelly, about purchasing her apartment and that she remained unwilling to sell it to them.

On December 14, 1994, plaintiffs entered into a contract to sell their apartment to the Smiths. The contract provided for a closing date of May 23, 1995 so that plaintiffs would have time to find another apartment. Ultimately, the closing took place on May 30, 1995.

In the interim, Durham and Chappell-Smith showed plaintiffs approximately 18 apartments. In the end, however, on March 21, 1995, plaintiffs entered into a contract to purchase an apartment through a different broker.

Thereafter, on or about May 8, 1995, Kelly decided to sell her apartment and listed it with at least six different brokers, including Stribling. Discovering the listing, the Smiths contacted Kelly and began negotiating to purchase Kelly's apartment. As previously indicated, the sale between plaintiffs and the Smiths closed on May 30th. Six days later, the Smiths entered into a contract with Kelly to purchase her apartment. Plaintiffs, seeing the Smiths accomplish that which they had long sought to do, commenced this action against defendants Stribling, Durham, Chappell-Smith, and Kelly seeking, among other things, damages for breach of fiduciary duty. Motions by defendants for summary judgment followed. Ultimately, defendants were granted summary judgment and plaintiffs brought this appeal.

In seeking reversal, plaintiffs contend that defendants had an ongoing fiduciary duty to notify them that Kelly had changed her mind and had listed her apartment for sale. Plaintiffs also contend that the information they imparted to defendants regarding the ability to combine their apartment with Kelly's apartment was secret and confidential information, which the Smiths were not permitted to act upon at any

time, even after the Smiths closed on plaintiffs' apartment. These claims lack merit.

It is axiomatic that a broker owes a duty of good faith and loyalty to his principal (*see, Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 164; *Wendt v Fischer*, 243 NY 439, 443; *Matter of Grant Realty v Cuomo*, 58 AD2d 251, 255). Based upon a broker's position of trust, she is under a duty, during the course of her employment, to disclose to her principal all material information she possesses or obtains concerning the transaction involved (*see, Matter of Grant Realty v Cuomo, supra*). Additionally, a broker may not make use of any confidential information obtained while acting as a broker in competition with or to the injury of her principal (Restatement [Second] of Agency § 395).

Bearing these general principles in mind, we begin our analysis by making several critical observations. First, there is no question that before the Smiths contracted to purchase plaintiffs' apartment, defendants acted properly in all respects. 19 NYCRR 175.4, which governs the conduct of a broker purchasing from a client, provides: "A real estate broker shall not directly or indirectly buy for himself property listed with him, nor shall he acquire any interest therein without first making his true position clearly known to the listing owner." Here, of course, defendants fully disclosed that the Smiths sought to purchase plaintiffs' apartment on their own behalf.

Second, notwithstanding plaintiffs' and the dissent's vague speculation to the contrary, after extensive discovery, the record is barren of any evidence that defendants contacted Kelly before December 14, 1994, the date plaintiffs contracted to sell their apartment to the Smiths. Nor is there any indication that, prior to that date, Kelly was willing to sell her apartment. In fact, Kelly specifically denied that defendants had contacted her prior to May 8, 1995 about purchasing her apartment.

Third, plaintiffs do not contend that the purchase price they received from the Smiths was unfair or did not represent the going rate in the real estate market at the time the contract was executed.

What the foregoing reveals is that defendants complied with their fiduciary obligations up to December 14, 1994, when plaintiffs contracted with the Smiths. This is especially so since, before contracting with the Smiths, defendants advised plaintiffs to attempt, once more, to purchase the Kelly apartment. Accordingly, if there has been a breach of fiduciary duty,

the breach must be predicated upon conduct subsequent to the Smiths' execution of the contract to purchase plaintiffs' apartment.

In seeking to establish such a breach, plaintiffs rely upon two theories. First, they assert that a fiduciary relationship between the parties continued even after execution of the contract so that defendants were obligated to disclose any postcontractual information they obtained regarding the Kelly apartment. Alternatively, they maintain that the information they imparted to defendants about the possibility of combining apartments 3-C and 3-D constituted confidential information which defendants improperly utilized after executing the contract to purchase their apartment. Neither theory withstands scrutiny.

As to the first theory advanced by plaintiffs, the emergent issue is whether a principal/broker relationship continued between plaintiffs and defendants after the contract of sale was executed. The answer to this question is pivotal since, in the absence of a continuing principal/broker relationship, defendants had no duty to disclose information they learned after contracting to purchase plaintiffs' apartment regarding the availability of the Kelly apartment (*see, Midcourt Bldrs. Corp. v Eagan,* 36 AD2d 90, *affd* 31 NY2d 728; *see also, Olson v Brickles,* 203 Va 447, 124 SE2d 895).

The courts of our State do not appear to have definitively addressed the issue of whether a fiduciary relationship survives the execution of a contract between a broker and her principal (*see, Yellot v Poritzky,* 170 AD2d 676; *Falle v Metalios,* 132 AD2d 518; *Geisler v Department of State,* 73 AD2d 392; *Midcourt Bldrs. Corp. v Eagan, supra*).[1] However, other jurisdictions considering the issue have concluded that a broker's fiduciary duty terminates when a legally binding contract to

---

**1.** The dissent's reliance upon *Falle v Metalios* (132 AD2d 518, *supra*) and *Geisler v Department of State* (73 AD2d 392, *supra*) as supporting a continuing fiduciary duty is misplaced. In *Falle,* the only issue was whether the defendants knew of the existence of a prospective purchaser who was willing to offer more for the subject property *before* the contract of sale was executed (*Falle v Metalios, supra,* at 519). The failure to disclose such information would, of course, be a clear violation of the defendants' fiduciary duties under well-settled law. In *Geisler,* the Court did not conclude that a broker has a duty to disclose postcontractual information to his former client. Rather, the Court held that the broker had a duty to close the transaction as quickly as possible where the broker was the purchaser and knew that his client required a prompt closing. Hence, if *Geisler* stands for any proposition, it is that defendants herein had a singular duty to timely close the transaction as they agreed upon in the contract.

purchase the client's property is executed (*see, e.g., Sylvester v Beck*, 406 Pa 607, 178 A2d 755 [Pa Sup Ct]; *Hardy v Davis*, 223 Md 229, 164 A2d 281 [Md Ct App]; *Jones v Allen*, 294 SW2d 259 [Tex Ct Civ App]; *Edna Mae Dev. Co. v Chicago Tit. & Trust Co.*, 79 Ill App 2d 251, 223 NE2d 285 [Ill App Ct]; *Clinkenbeard v Central Southwest Oil Corp.*, 526 F2d 649 [5th Cir]; *Irby v Lee*, 512 P2d 253 [Okla Ct App]; *First Trust Co. v McKenna*, 188 Mont 534, 614 P2d 1027 [Mont Sup Ct]).[2] Consistent with these cases, we conclude that, where a broker contracts to purchase her client's property, the relationship of principal/broker terminates when the contract is executed, thereby severing the fiduciary relationship.

In reaching this conclusion and following the rule enunciated in other jurisdictions, we are persuaded, in part, by the fact that defendants were hired to find a purchaser for plaintiffs' apartment. Since defendants accomplished their task and there was nothing left for them to do with respect to selling that apartment, it follows that the principal/broker relationship terminated (Restatement [Second] of Agency § 106; *see also, Midcourt Bldrs. Corp. v Eagan, supra*). The policy considerations generally at play when fiduciary duties are imposed likewise support our conclusion. The imposition of fiduciary duties, such as the duty of disclosure (which is the principal duty at issue here), seeks to assure that the principal may rely on the undivided fidelity of a broker throughout the transaction for which the broker was employed (*see, Penato v George*, 52 AD2d 939, 942, *appeals dismissed* 42 NY2d 908; *see also, Cogan v Kidder, Mathews & Segner*, 97 Wash 2d 658, 663, 648 P2d 875, 877-878). Where a broker's employment terminates, however, and the parties are transformed from principal/broker to contract-vendor/contract-vendee, it cannot be said that the former principal is relying on his former broker to guide him in the transaction. At the moment of contract, any reasonable person (and certainly plaintiffs, who were sophisticated marketing and securities attorneys), would recognize that the parties' relationship had experienced a fundamental metamorphosis—a metamorphosis so substantial that it no longer

---

2. Contrary to plaintiffs' contention, *Irby* and *First Trust* do not hold that a broker's fiduciary duties continue up to the date of closing in any and all circumstances. To the contrary, each of these cases makes clear that if there had been a binding contract between the broker and his principal before the date of closing, the fiduciary relationship would be cut off on the date of contracting. The only reason both cases found a continuing fiduciary duty until the date of closing was because there had not been a binding contract before that time.

retained any of the fiduciary characteristics previously associated with it (*see, Midcourt Bldrs. Corp. v Eagan, supra,* at 94). This new relationship was defined by the terms agreed upon by the respective parties in the contract of sale.

Recognition of this change in roles is supported by traditional principles applicable to the sale of real property. As was stated by the Court of Appeals in *Williams v Haddock* (145 NY 144, 150): "The general rule in regard to contracts for the sale of land is that the owner of the real estate from the time of the execution of a valid contract for such sale is to be treated as the owner of the purchase money, and the purchaser of the land is treated as the equitable owner thereof. The vendor is deemed in equity to stand seised in the land for the benefit of the purchaser, and the latter, even before the conveyance to him, can devise the same." Thus, immediately upon the formation of a contract, the purchaser is vested with equitable title, while the seller holds legal title only as security for the payment of the purchase price (*see, Thomson v Smith,* 63 NY 301).

By analogy, at the moment the parties contracted for the sale of shares in the coop corporation and the transfer of the leasehold, the Smiths could no longer be considered plaintiffs' brokers since they were essentially transfigured into the equitable owners of the apartment. Since a broker is one who acts to sell property on behalf of another (*see,* Real Property Law § 440 [1]), by definition defendants could not contemporaneously occupy the mutually exclusive roles of equitable owner and broker.

The dissent nevertheless finds this analysis flawed, on the ground that an "ordinary person" continues to place reliance upon the broker until the time of closing. Thus, the dissent points out that the broker often becomes involved in postcontractual negotiations on behalf of her principal following the "results of inspections and testing." Additionally, further undefined negotiations may be required if the purchaser is unable to obtain financing. The dissent's identification of these postcontractual responsibilities cogently demonstrates the incongruity of extending the fiduciary relationship where the broker is the purchaser of the property.

By way of example, assuming the Smiths had been unable to obtain financing, the dissent would have obligated them to negotiate on behalf of plaintiffs and against themselves, possibly in an effort to forfeit their own down payment. Similarly, the dissent would require the Smiths to negotiate on behalf of plaintiffs and against themselves if an inspection revealed that

the premises had severe structural defects. Presumably this would mean that the Smiths would have to forego any contractual rights they might have to cancel the contract or seek a reduction in price based upon the defects. It strains all bounds of credulity to believe that any person, let alone these sophisticated plaintiffs, would expect that the purchasers of the subject property would simply abandon their contractual rights. After all, what could possibly be the purpose of contracting if not to define the parameters of the parties' respective rights and obligations? It is this question that plaintiffs and the dissent fail to answer.

In determining that defendants' fiduciary duties terminated in this case upon the execution of the contract of sale, we do not, as the dissent contends, adopt a bright line rule that the execution of a contract will always cut off a broker's fiduciary obligations. Where the broker is not the purchaser there may be good reason to extend the broker's fiduciary duties until the time of closing. In this connection, during the period between contract and closing the broker may, among other things, still have a duty to shepherd the transaction to fruition on behalf of her principal (*see, e.g., Owen v Shelton*, 221 Va 1051, 277 SE2d 189). We need not, however, address this issue. Suffice it to say that when the broker is the purchaser, the brokerage relationship, along with its fiduciary obligations, terminates upon execution of the contract.

This brings us to the question of the use of allegedly confidential information, namely, the possibility of combining plaintiffs' apartment with the Kelly apartment. As indicated previously, a broker may not use or communicate information confidentially given to her by her principal in competition with or to the injury of her principal (*see*, Restatement [Second] of Agency § 395). Defendants in this case did not violate this rule.

We initially find that there was nothing secret about the subject information (*cf., Ashland Mgt. v Janien*, 82 NY2d 395, 407). Not only had other apartments in the building been combined in the past, but the plans for at least one of the combined units had been in Stribling's files since 1991. Thus, plaintiffs' purported secret was apparently already known, not only to plaintiffs' neighbors, but to defendants. We also note that in the context of the current real estate market, it is hardly a secret that neighboring apartments can often be combined into a single, larger unit. That which is commonly known cannot be garbed by a cloak of confidentiality merely because a seller repeats it to a broker when listing her property for sale.

Moreover, plaintiffs' claim that information about combining apartments was confidential is incredible as a matter of law. After all, this information was precisely the type any rational seller would seek to exploit in order to obtain a higher sales price. In this regard, a broker, in an attempt to make plaintiffs' apartment more attractive to prospective buyers, would be expected to advise them that if the neighboring apartment were to become available at some point in the future, the apartments could be combined.

In any event, there is no reason in policy or logic to justify precluding the Smiths from using this information. As plaintiffs permanently contracted away any rights to their apartment for fair consideration and their initial reason for wishing to purchase the Kelly apartment no longer existed, defendants did not usurp an opportunity that could have been of value to plaintiffs. Stated otherwise, defendants did not use confidential information in competition with, or to the detriment of, plaintiffs.

Notwithstanding all of the reasons for bringing the fiduciary relationship to an end when plaintiffs and the Smiths contracted, the dissent contends that the Smiths had a fiduciary duty to disclose to plaintiffs that the Kelly apartment had become available. It must necessarily follow that a breach of that duty makes it permissible for plaintiffs, among other remedies, to rescind their contract with the Smiths (*see, Wendt v Fischer*, 243 NY 439, 443, *supra*). What the dissent therefore concludes is that the remedy of rescission is appropriate, notwithstanding that the broker has complied with the law in every respect before contracting with her principal. This conclusion effectively relegates an entire category of contracts, specifically, those that have been lawfully entered into between a broker and her principal after full disclosure, to some lesser status—a status that permits a seller to unilaterally void the contract in the absence of fraud, mistake, or duress. Hence, the dissent would hold that a broker cannot bind her principal even if she complies with every ethical canon before executing the contract. We do not believe that such a novel, sweeping, and unwarranted change in well-established principles of contract law has any justification.

If, on the other hand, the dissent does not believe rescission is an appropriate remedy, then the fiduciary duty for which it advocates is a meaningless charade. Under this scenario, the broker has a duty to inform her former principal that the adjoining apartment has become available after the signing of

the contract, but the principal has no right to rescind the contract after being so informed. If there is no such right, it follows there should be no antecedent duty.

Recognizing the inevitability of the foregoing conclusions, plaintiffs nevertheless argue that a fiduciary relationship continued beyond the December 14, 1994 contract date because they engaged defendants to show them other apartments. Plaintiffs, however, misconstrue the precise contours of the newly created relationship.

With regard to plaintiffs' purchase of another apartment, defendants were not plaintiffs' broker. Rather, defendants were acting on behalf of the sellers of these other apartments, who would pay their commission (*see*, Reuschlein and Gregory, Agency and Partnership § 17 [A], at 45 [2d ed 1990]). Thus, no fiduciary duty ran to plaintiffs.

In any event, assuming, arguendo, that defendants were plaintiffs' brokers for the purpose of purchasing another apartment, any fiduciary duties that were owed would extend only to matters within the scope of defendants' new employment (*see*, Restatement [Second] of Agency §§ 23, 390, comment *d*). Here, after the Smiths contracted with plaintiffs, defendants were employed only to assist plaintiffs in finding another apartment. Therefore, any fiduciary duties extended only to that specific employment.[3]

In the end, plaintiffs contracted away all of the legal rights of ownership they had to their apartment after full disclosure by defendants. The contract being legally binding and not subject to rescission, the Smiths had every right, just as any other contract-vendee, to take advantage of any opportunities that would be beneficial to their ownership, including purchasing the neighboring apartment. To conclude otherwise would mean that defendants were obligated to notify plaintiffs of the availability of the Kelly apartment, and that the Smiths were obligated to gratuitously give up their right to enforce a valid, binding contract. We cannot perceive any legal justification to support such an outcome.

We have considered plaintiffs' remaining arguments and find them to be without merit.

---

**3.** Any fiduciary duties emanating from this postcontractual relationship terminated, in any event, in or about March 1995, when plaintiffs contracted to purchase another apartment through a different broker. Hence, to the extent that defendants could be viewed as having a fiduciary duty extending to all aspects of their relationship with plaintiffs, that fiduciary duty terminated months before the Smiths negotiated for the Kelly apartment.

Accordingly, the judgment of the Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered August 11, 1998, which, upon an order of the same court and Justice, entered July 2, 1998, granted summary judgment in favor of defendants and dismissed the complaint, should be affirmed, without costs. The appeal from said order should be dismissed, without costs, as subsumed within the appeal from the aforesaid judgment.

SAXE, J. (dissenting). Nearly 75 years ago, Judge Benjamin N. Cardozo expressed concern regarding the possibility of abuses of trust committed by real estate brokers in pursuit of their profession. "The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost." (*Roman v Lobe*, 243 NY 51, 54.)

On this appeal, Judge Cardozo's concerns are ever present. Specifically, we are required to determine the duration of the fiduciary duty owed by a real estate broker engaged to sell a client's property, but who instead becomes the purchaser of the property.

It is often said that a real estate broker is entitled to a commission upon finding a buyer ready, willing and able to purchase on the terms requested by its client (*see, Lane—Real Estate Dept. Store v Lawlet Corp.*, 28 NY2d 36, 42; 11 NY Jur 2d, Brokers, § 119, at 567). In accord with this basic premise, the majority concludes that once this point is reached, the broker's fiduciary duty to the client abruptly ceases. Further, it concludes that when the broker becomes the purchaser, the same broad principle should apply, because the contemplated "task" of the fiduciary relationship has been accomplished. I believe that this conclusion emanates from a static view of the common law and fails to take into account both the nature of the broker-client relationship and the extent to which obligations ought to be imposed on real estate brokers generally.

The essential facts alleged by plaintiffs are as follows: Elizabeth and Thomas Dubbs, both lawyers (neither practicing in the field of real estate law), owned a two-bedroom cooperative apartment (No. 3-C) at 139 East 94th Street in the Carnegie Hill section of Manhattan. Desiring more space, they contacted their next door neighbor (apartment No. 3-D), a Ms. Nancy Kelly, and inquired about her interest in selling her apartment to them. Ms. Kelly indicated that she was not interested in selling at that time but would advise them if she changed her

mind. For their part, Mr. and Ms. Dubbs assert that they told Ms. Kelly that they would match any offer she received.

In mid-1994, plaintiffs listed their apartment with defendant broker Stribling & Associates, pursuant to an open listing; there was no written brokerage agreement between plaintiffs and any of the defendants. From time to time, salespersons from Stribling & Associates showed apartment No. 3-C to possible purchasers. Plaintiff sellers informed Stribling that, rather than sell their apartment, their strong preference was to purchase the adjoining apartment, No. 3-D, and combine the two, although up to that time the owner of No. 3-D had declined to sell.

In October or November 1994, defendant Avery Chappell-Smith, a real estate salesperson employed by defendant Stribling, showed plaintiffs' apartment to her husband. Shortly thereafter, Ms. Chappell-Smith and her husband made an offer on the apartment. After some negotiations, a price was agreed upon and a contract executed in mid-December, 1994.

Stribling's salespeople continued to work with plaintiffs in their search for a new apartment; ultimately, however, plaintiffs contracted on March 21, 1995 to purchase an apartment on East 72nd Street that had been shown to them by a different broker.

The closing of Ms. Chappell-Smith's purchase of apartment No. 3-C took place on May 30, 1995. It is undisputed that *prior to* this date, Ms. Chappell-Smith entered into negotiations with Ms. Kelly to purchase apartment No. 3-D, ultimately resulting in a contract of sale. Ms. Chappell-Smith asserts that she did not become aware of Ms. Kelly's decision to sell No. 3-D until May 8, the day Kelly formally listed it for sale. Mr. and Ms. Dubbs challenge the credibility of this assertion, and advance their belief that Ms. Chappell-Smith's negotiations with Ms. Kelly began earlier than admitted. They further contend that the formal listing of apartment No. 3-D was done to create the false impression that it had been made available for sale on the open market.

Plaintiffs assert, and it is undisputed that, in Manhattan's real estate market, the combination of two adjacent cooperative apartments produces an economic value greater than the sum of its parts. Accordingly, by keeping the availability of apartment No. 3-D to herself, it is contended, Ms. Chappell-Smith was able to capture the premium value of the two apartments once they were merged into a single dwelling unit.

Plaintiffs base this action upon the claim that defendant brokers' failure to disclose the availability of the adjacent

apartment violated their fiduciary duty as well as the applicable regulation dictating the conduct of brokers (*see*, 19 NYCRR 175.4). They seek money damages and an accounting of any profits made or to be made by defendants as a result of Ms. Chappell-Smith's purchase of their apartment. I conclude that the IAS Court was wrong in dismissing plaintiffs' complaint pursuant to defendants' summary judgment motion, because I believe that defendants owed plaintiffs a continuing fiduciary obligation, which they violated when the broker/purchaser took advantage of an opportunity which belonged to, and should have been offered to, the client.*

To determine whether defendants continued to owe plaintiffs a duty after the contract of sale was executed, we must begin by considering the nature of that duty.

The field of real estate sales is, as Judge Cardozo recognized, unusually vulnerable to the possibility that those with special access to inside information will take advantage of those they are employed to serve. For instance, brokers have access to the information gained both from clients and from potential purchasers; absent an obligation to act in their client's best interests rather than their own, this inside information would enable brokers to purchase the property from the client, and then to resell it at a profit. Accordingly, our law holds real estate brokers to the standard of a fiduciary (*see*, *Wendt v Fischer*, 243 NY 439). The fiduciary obligation owed by a real estate broker is defined as the duty to exercise *utmost* good faith and not to act in a manner inconsistent with his client's interests (*see*, *John J. Reynolds, Inc. v Snow*, 11 AD2d 653, 654, *affd* 9 NY2d 785). In accordance with this strict and unyielding standard, a real estate broker interested in purchasing the property of a client/seller cannot do so with the same freedom as can any other interested purchaser. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place." (*Meinhard v Salmon*, 249 NY 458, 464 [Cardozo, Ch. J.]; *see also*, *Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 162.)

Along these lines, a broker may not buy a property from his principal without full and frank disclosure (*see*, 19 NYCRR

---

* However, plaintiffs' contention that defendants misused confidential information must be rejected. In accord with the majority, I see no rational basis upon which the status of "confidential information" could be given to the information that the C- and D-line apartments could be combined, thereby creating additional value.

175.4; *TPL Assocs. v Helmsley-Spear, Inc.*, 146 AD2d 468). Indeed, a failure to make full disclosure is not excused even where a broker demonstrates that he acted in good faith, nor where the terms arranged were the best obtainable on the open market; injury is presumed (*see, Wendt v Fischer*, 243 NY 439, 443-444, *supra*). Protection of the client is so paramount that the transaction may be set aside *at the behest of the client* once it has been determined that the broker failed to fully reveal a conflict of interest (*supra*). In this way, brokers are prevented from entering into business arrangements in which they make profits that would otherwise be made by their client.

The broker's fiduciary obligation further requires that if the broker acquires information that would be advantageous to the client, he may not act upon it without first advising the client. A real estate broker "cannot put himself in a position antagonistic to his principal's interest by * * * failing to communicate information he may possess or acquire which is or may be material to his employer's advantage" (Eichelberger, Annotation, *Real-Estate Broker's or Agent's Misrepresentation to, or Failure to Inform, Vendor Regarding Value of Vendor's Real Property*, 33 ALR4th 944, 947; *see generally*, 12 Am Jur 2d, Brokers, §§ 110-120). For this reason, it is unassailable that if, *while the broker still owed a fiduciary duty to plaintiffs*, and knowing of the clients' interest in the neighboring apartment, defendant broker learned of the availability of apartment 3-D, the broker's duty of undivided loyalty to the clients would have required that the clients be informed of it immediately.

Nevertheless, while the strict parameters of the broker's duty are not disputed, the parties disagree as to the duration of the duty. The majority asserts that the law of this State has not definitively established the duration of the fiduciary duty of a real estate broker who contracts to purchase a client's property. It then adopts the rule of a number of other jurisdictions, holding that the fiduciary relationship is severed upon execution of a legally binding contract to purchase the client's property (*see, e.g., Hardy v Davis*, 223 Md 229, 164 A2d 281; *Jones v Allen*, 294 SW2d 259 [Tex Civ App]; *Clinkenbeard v Central Southwest Oil Corp.*, 526 F2d 649 [5th Cir]). It further buttresses the adoption of this rule by emphasizing the venerable common-law principle of equitable title, by which a purchaser of land becomes vested with an equitable title upon the formation of a contract of sale (*see, Williams v Haddock*, 145 NY 144, 150; *Thomson v Smith*, 63 NY 301).

Without calling into question the continuing viability of this feudal-based doctrine, I dissent, concluding that the conditions, customs and nuances of modern real estate practice warrant the application of special protections when a real estate broker arranges to purchase a client's property.

It is both because real estate brokers are privy to information not available to their clients, and because a few will inevitably succumb to the temptation of profiting from that information, that our law has implemented protections against such abuses. Not only does our common law impose a fiduciary duty upon brokers, but, in addition, our Legislature has required that real estate brokers be licensed: "[t]he intrinsic nature of the business combines with practice and tradition to attest the need of regulation" (*Roman v Lobe*, 243 NY 51, 54, *supra*).

The purpose of the strict fiduciary duty imposed upon real estate brokers is to protect clients from brokers acting in their own self-interest rather than the interest of their clients. To terminate that duty, as the majority suggests, at the instant a broker becomes the contract-vendee of the client's property, would deprive the client of the law's protection when it is needed most. At the moment when the contract of sale is executed, the broker, who previously acted to protect his client's interests, suddenly occupies a position adverse to the former client. In this situation, the best way to avoid the possibility of the broker taking unfair advantage of information unavailable to the client is to continue to hold the broker to the standard of a fiduciary until the transaction is fully completed by passage of title and payment of the purchase price.

Moreover, the law regarding the duration of the fiduciary duty is not so much unsettled as undeveloped. Initially, the language of the applicable regulation must be read carefully (*see*, 19 NYCRR 175.4). This regulation prohibits a broker from *buying* a client's property without full disclosure (*ibid.*). The use of the word "buy" in this context is best understood to mean a continuation of the broker's duty to make full disclosure until consummation of the sale.

In addition, the courts of this State have remarked on more than one occasion that a broker acting as contract-vendee does not obliterate his fiduciary duty to the client solely by virtue of signing a contract (*see, Falle v Metalios,* 132 AD2d 518, 520; *Geisler v Department of State*, 73 AD2d 392, 395). In *Falle v Metalios*, the defendant broker contracted to buy his client's property, and the seller alleged that at the time of the contract the broker knew of, but did not disclose, the interested

purchaser who then purchased the property, giving the broker a profit of $14,000. In affirming the denial of summary judgment to both the broker and the seller, the Court remarked that "[t]he fact that Mr. Metalios [the broker] had acted as contract vendee did not terminate his obligations to the plaintiff to act in her best interest" (*supra*, at 520; *see also, Geisler v Department of State*, 73 AD2d 392, 395, *supra* ["(t)he fact that (the broker) then undertook to buy the property individually did not divest him of his responsibility to the (client)"]).

It is important to bear in mind that our State has served as both the source and the repository of a richly developed body of law regarding fiduciary duty, particularly in the area of real estate sales, in which considerations of public policy are of utmost importance (*see, e.g., Meinhard v Salmon*, 249 NY 458, 463-464, *supra; Wendt v Fischer*, 243 NY 439, *supra*). The rule applied by the majority is not founded upon the considerations of public policy that are so essential to our common law in this area, and it is inappropriate for us to adopt a rule lacking such a foundation.

Furthermore, in deciding whether our common law will continue to impose a broker's fiduciary duty past the execution of a contract of sale, we should take into account the parties' respective positions and reasonable expectations. Historically, our common law has developed with an eye toward protecting against unfairness. "The life of the law has not been logic: it has been experience" (Holmes, The Common Law, at 1 [1881]). The development of the law of quasi-contract and unjust enrichment demonstrates how equitable remedies arose when the strict requirements of contract law prevented courts from arriving at a just result in legal disputes (*see generally*, Dobbs, Remedies § 4.2, at 235 [1973]). While we need not import equitable doctrines in this instance, it is appropriate to extend a legal rule so as to comport with the reasonable expectations of those who rely upon brokers to be trustworthy.

With this in mind, I would hold that, based upon principles of fairness, common sense, and the reasonable expectations of those buyers and sellers who rely on the services of real estate brokers, the duration of a broker's duty to its client should extend to the date that most precisely reflects the end of the real estate transaction: the date that title passes.

I reject the assertions of the majority that defendant brokers were merely hired "to find a purchaser for plaintiffs' apartment" and that, once that task was accomplished, "there was nothing left for them to do." When it comes to the purchase

and sale of real estate in New York, rarely is a broker's function limited to merely finding a buyer of property.

For most people, the sale or purchase of a home—whether a cooperative apartment, condominium, or house—is a major step, uniquely important and emotion-laden and completely unlike any other purchase. The ordinary person embarking upon this experience places much reliance on the broker in the course of the transaction to conclude the most favorable deal. There is often a barrage of questions and concerns, and frequent expressions of anxiety, on the part of the client. In this context, the broker frequently becomes a confidant, advisor, and negotiator.

As a practical matter, the execution of a contract of sale is only the beginning of the transaction. Issues often continue to arise to which the broker must attend between the contract signing and closing. Brokers may become involved in further negotiations following receipt of the results of inspections and testing. The brokers of coop purchasers generally handle the purchaser's submission to the coop board of directors for board approval. If a purchaser is unable to obtain the requisite financing, the broker may be involved in further negotiations. Indeed, even where a purchaser has successfully obtained a mortgage commitment and all has fallen into place, if the purchaser thereafter happens to lose her job through no fault of her own, and the mortgagee withdraws its mortgage commitment, the intended purchaser may be entitled to cancel the contract (*see, Kapur v Stiefel*, 264 AD2d 602). Even the fact that a broker normally is not paid a commission until closing may reflect the notion that locating a buyer willing to undertake the purchase is not necessarily the final step.

The sale transaction therefore must be recognized as a two-step process, which only concludes at the passage of title. Once we recognize that the transaction does not conclude until the closing, there is little logic in cutting off the broker's fiduciary duty prior to that time. Nor must a broker's fiduciary duty be coterminous with the earning of commissions; his duty should not be considered automatically extinguished merely because he is deemed to have earned his commission upon locating a ready, willing and able buyer (*see, First Trust Co. v McKenna*, 188 Mont 534, 541, 614 P2d 1027, 1031).

It is also worth noting that in some jurisdictions, the settled law holds that a real estate broker "is obligated, *until the time of closing*, to disclose to his principal all facts which he has or has acquired during their relationship which might reasonably

affect the decisions of his principal" (*T-A-L-L, Inc. v Moore & Co.*, 765 P2d 1039, 1041 [Colo App] [emphasis added], *affd in part and revd in part on other grounds* 792 P2d 794, citing *Wheeler v Carl Rabe, Inc.*, 198 Colo 311, 599 P2d 902 [after execution of sale contract, broker received higher bid, notified purchaser but not seller]). Still other authorities point out that, even if the fiduciary relationship between the seller and the broker generally ceases to exist upon execution of the contract of sale, the fiduciary relationship must be deemed to continue if the need to satisfy further conditions puts into question the ability to close on the deal (*see, e.g., Cogan v Kidder, Mathews & Segner*, 97 Wash 2d 658, 664, 648 P2d 875, 878; *Ward v Coldwell Banker/San Juan Props.*, 74 Wash App 157, 872 P2d 69).

As a matter of policy, rote application of a hard-and-fast rule that the broker's fiduciary duty is extinguished at the moment a contract of sale is signed will lead to results that will appear unjust to the general public. Indeed, the facts of some of the cases in which such a rule is automatically applied serve to illustrate why it should be rejected. In *Jones v Allen* (294 SW2d 259, *supra*), a real estate broker found a purchaser for the client's property at a price of $13,500. Three days after an earnest money contract was executed, another party appeared at the broker's office and offered to pay $19,000 for the property. The broker then arranged to buy the property directly from the purchaser for $15,000 and reconvey it to the newly appearing purchaser for $19,000, gaining a profit of $4,000. The Texas Court of Civil Appeals concluded that the agency relationship between the broker and his client was terminated when the earnest money contract was signed, leaving the broker free to immediately thereafter use information *gained through his position as agent* to earn a profit (*supra*, at 263-264), notwithstanding that the profit "could have accrued to the principal had he been fully informed" (*Clinkenbeard v Central Southwest Oil Corp., supra*, 526 F2d, at 652; *see also, Sylvester v Beck*, 406 Pa 607, 178 A2d 755).

To permit a broker to earn a profit from information he obtained through his position as the client's broker runs counter to the principles enunciated by Justice Cardozo in *Roman v Lobe* (243 NY 51, 54, *supra*), and in cases such as *John J. Reynolds, Inc. v Snow* (11 AD2d 653, 654, *supra*). The public has the right to expect better than the "morals of the market place" (*Meinhard v Salmon, supra*, at 464) from real estate brokers who receive information in the context of real estate

transactions that is not available to the general public. Yet, if we adopt the rule that brokers' fiduciary duties cease as a matter of law when the broker signs a contract of sale, the "morals of the market place" are exactly what we can expect to promote.

What is more, we may assume that abuses would result. It is simply too easy for an unscrupulous broker, aware of the client's bottom-line price and of an offer for a far greater sum, to arrange a resale, to both his and the new buyer's advantage. As long as the new buyer denies having made the larger offer prior to the broker's contracting to buy the client's property, the broker and new buyer can both freely profit—at the client's expense—from a resale by the broker to the new buyer.

In view of the language of the applicable regulation, and the overriding policy of protecting clients from the possibility of brokers' self-dealing, I would apply the rule that a real estate broker "is obligated, until the time of closing, to disclose to his principal all facts which he has or has acquired during their relationship which might reasonably affect the decisions of his principal" (*T-A-L-L, Inc. v Moore & Co., supra*, 765 P2d, at 1041). This rule should certainly apply to a situation where the broker has become the buyer of the client's property. Given the ever present possibility of self-dealing, the broker's fiduciary obligation to inform the client/seller of advantageous information should extend further, rather than be cut off at the earliest possible date. Indeed, the only reason I would not extend it even further for the protection of the public is the recognition that there is a need for a clear line reasonably circumscribing the broker's duty to the client.

Of course, it is possible for a broker to purchase a client's property—and, indeed, a contiguous parcel—without impropriety (*see, Yellot v Poritzky*, 170 AD2d 676). In *Yellot*, as here, the broker who purchased the property listed by his client also purchased a contiguous property. However, in *Yellot* there was no basis upon which to conclude that the broker had an obligation to inform his client that he was also purchasing the contiguous property. There was no indication that the client ever informed the broker of the client's preference to purchase the neighboring property rather than sell his own; furthermore, the Court specifically noted that the property contiguous to the plaintiff's had been available for sale *at all times* (*supra,* at 677).

Here, in contrast, the contiguous property, apartment 3-D, was never made available to plaintiff, and the broker obtained knowledge of its availability before closing title on apartment

3-C. It is also noteworthy that in *Yellot* the issue of whether the broker had breached his fiduciary duty was decided after hearing the plaintiff's evidence at trial, rather than dismissing it in the context of a summary judgment motion.

Nor does the fact that Mr. and Ms. Dubbs had already entered into a contract to purchase another apartment change the broker's obligation here. Defendants' argument that disclosing the availability of 3-D would have been meaningless is incorrect. We cannot presume that plaintiffs' contractual obligation with respect to the 72nd Street apartment would have been an absolute impediment to their taking action to obtain that which they had sought all along: the combination of apartments 3-C and 3-D. The possibilities are myriad. Plaintiffs might have been able to assign their rights under the 72nd Street apartment contract to another interested purchaser; they could have reached an agreement with the sellers of the 72nd Street apartment to rescind the agreement for a portion—or even all—of their down payment; perhaps they even could have afforded to buy it as an investment while still purchasing 3-D.

The majority protests that permitting a client the right to rescind in these circumstances would relegate to a lesser status a sale contract in which the broker is the purchaser. However, we see nothing necessarily wrong with this limitation of the contract rights of a broker-purchaser. It is unusual for a broker to become a buyer of the listed property—a broker's contract to purchase her own client's property is inherently suspect. When a broker contracts to purchase an apartment from her client, she should not be immediately transformed into an ordinary buyer, whose rights are protected by the certainties of the law of contracts. Indeed, in view of the established rule that if a broker fails to make full disclosure of his relationship to the purchaser, the client has the option of canceling the sale contract (*Wendt v Fischer*, 243 NY 439, *supra*), there is nothing egregious or inappropriate in applying a similar rule to a broker who has arranged to purchase the client's property without disclosing important financial information in her possession.

Even if plaintiffs had no automatic right to rescission of the contract on 3-C, they had a right to *seek* its rescission. Moreover, like any signatory to a contract, they had a right to determine that it was more advantageous to them to breach the agreement (and suffer any resulting contract damages) than to comply with its terms.

For all the foregoing reasons, I believe it was error to dismiss plaintiffs' claim that defendants are liable for violation of their

fiduciary duty. Until the May 30, 1995 closing on apartment 3-C, Ms. Chappell-Smith had an ongoing obligation to fully disclose to Mr. and Ms. Dubbs that apartment 3-D had become available. Indeed, there being no dispute that (1) defendants knew of the availability of 3-D before closing, (2) defendants knew of plaintiffs' interest in 3-D, and (3) defendants did not inform plaintiffs that 3-D was being offered for sale, the breach of that duty is established. I would reverse and reinstate the complaint.

SULLIVAN, P. J. and NARDELLI, J., concur with FRIEDMAN, J.; WALLACH and SAXE, JJ., dissent in a separate opinion by SAXE, J.

Judgment, Supreme Court, New York County, entered August 11, 1998, affirmed, without costs. Appeal from order, same court, entered July 2, 1998, dismissed, without costs.